**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DAVID ANDRICHYN
1904 Maple Circle
Lansdale, PA 19446

and

GLADSTONE WILLIAMS
188-01B 71 Crescent, Apt.1A
Fresh Meadows,  NY 11365

*individually and on behalf of themselves and all
others similarly situated,*

                            Plaintiffs,

          vs.

TD BANK, N.A.,
1701 Route 70 East
Cherry Hill, New Jersey 08034

                            Defendant.

**Complaint -- Class Action**

Civil Action No. _____

**TABLE OF CONTENTS**

Page No.

INTRODUCTION ....................................................................................................................1

THE PARTIES .........................................................................................................................4

JURISDICTION AND VENUE ...............................................................................................5

COMMON FACTUAL ALLEGATIONS.................................................................................6

A.     State Laws Banning Payday Loans ................................................................6

B.     TD Bank's Standard Account Agreement......................................................8

C.     New York State Provided TD Bank With Specific Information Regarding Certain of
Plaintiffs' Illegal Payday Lenders, and TD Bank Ignored It ..............................................10

D.     TD Bank Actively Monitors ACH Transactions and Was Aware of Other Illegal
Payday Loan Activity.............................................................................11

E.     Pursuant to NACHA Rules, TD Bank Monitors Its Accounts for Illegal Activity.............14

F.     The ACH Network Provided TD Bank With Information Sufficient To Identify
Illegal Payday Lenders and Loans ..................................................15

G.     State And Federal Regulatory Agencies, Public Records, And Media Reports Alerted
TD Bank To The Illegal Payday Lenders Unlawful Activities Across The Country
And In The States Of Pennsylvania And New York........................18

H.     Plaintiffs Internet Payday Loans ..................................................23

CLASS ACTION ALLEGATIONS ......................................................................................32

FIRST CLAIM FOR RELIEF
BREACH OF CONTRACT ...................................................................................................35

SECOND CLAIM FOR RELIEF
BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING .........................36

THIRD CLAIM FOR RELIEF
UNCONSCIONABILITY ......................................................................................................37

FOURTH CLAIM FOR RELIEF
CONVERSION......................................................................................................................38

i

FIFTH CLAIM FOR RELIEF
UNJUST ENRICHMENT (IN THE ALTERNATIVE) ...............................................40

SIXTH CLAIM FOR RELIEF
VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND  CONSUMER
PROTECTION LAW 73 P.S. §§ 201 *et seq*...............................................................41

SEVENTH CLAIM FOR RELIEF
VIOLATION OF NEW YORK GBL §§ 349 *et seq*.....................................................42

PRAYER FOR RELIEF ...........................................................................................43

Plaintiffs, David Andrichyn and Gladstone Williams, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendant, TD Bank, N.A. ("TD Bank" or the "Bank"), arising from TD Bank's processing debits on its customers' bank accounts ("account" or "deposit account") from payday lenders it knew were making unlawful payday loans in Pennsylvania and New York.

2.      Payday loans are short term high interest loans for small amounts of money that typically come due in a matter of days or weeks and require the borrower to provide the payday lender with access to his/her deposit account for repayment.   However, payday loans are typically made without any consideration of the borrower's ability to repay and because of the extremely high interest costs (ranging anywhere from 400% to over 1000%, in most cases) the borrower is forced to "renew" or "rollover" the debt.   This results in interest-only payments where the principal is difficult to pay off and additional fees.    Accordingly, because of the manner in which payday loans are structured and the exceedingly high costs of interest and fees, most borrowers become ensnared in debt traps and end up in a much worse financial position than if they had never taken out the loans in the first place.

3.      As a result of these "debt traps" and the unconscionable nature of these loans, at least fourteen jurisdictions across the nation have either banned payday loans directly or effectively banned them by operation of a strict interest rate cap.  Payday loans are illegal in

Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia.

4.     Many unscrupulous payday lenders (often based offshore or purportedly based on Native American reservations in an attempt to avoid application of American laws) make use of the Internet to circumvent these jurisdictions' prohibitions and directly offer payday loans to consumers (the "Illegal Payday Lenders").   These loans ("Illegal Payday Loans") feature crushing interest rates and other illegal terms.

5.     Illegal Payday Lenders' ability to defy state law directly hinges on the cooperation of financial institutions like TD Bank—which process Illegal Payday Loan debits and credits on their account holders' deposit accounts—providing Illegal Payday Lenders the access to the mainstream electronic payment system that is their lifeblood.

6.     The mainstream electronic payment system, which provides individuals and businesses (including Illegal Payday Lenders) access to electronic debits and deposits to consumer deposit accounts, is called the "Automated Clearing House" or "ACH Network."  The ACH Network is the backbone for the electronic movement of money and data in the United States.  TD Bank and other financial institutions tasked with making debits or credits on their customers' deposit accounts are known, in ACH Network terminology, as Receiving Depository Financial Institutions ("RDFIs").

7.     NACHA (previously the National Automated Clearing House Association) manages the development, administration, and governance of the ACH Network.  The NACHA Operating Rules are an extensive set of rules and regulations that govern and provide ACH Network participants with the legal framework for the ACH Network.  The NACHA Operating Guidelines provide guidance on implementing the Operating Rules (the Operating Rules &

Guidelines are collectively referred to herein as "NACHA Rules"). The introduction to the NACHA Rules states that the rules "serve[] as the definitive source of information governing the exchange and settlement of electronic fund transfers through the ACH Network."

8.   The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to *all* state and federal laws in the United States. These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

9.   That is why the State of New York has specifically urged TD Bank to stop processing Illegal Payday Loan transactions for loans issued by Illegal Payday Lenders used by Plaintiffs and the Classes. Yet TD Bank continued to knowingly process Illegal Payday Loans, despite this specific knowledge and warning, harming Plaintiffs and the Classes.

10.   TD Bank's contracts with its customers also require the bank to adhere to the NACHA Rules. Thus, when TD Bank debits its customers' deposit accounts for Illegal Payday Loans it not only violates the NACHA Rules, but also its contractual agreements with its customers.

11.   Indeed, it would be impossible for Illegal Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' deposit accounts in jurisdictions where the loans are illegal without TD Bank's willingness to debit its customers' deposit accounts for Illegal Payday Loans.

12.   TD Bank knows and can easily identify Illegal Payday Lenders and Illegal Payday Loan debits and deposits. ACH entries clearly identify the merchant requesting payment. In August, 2013, TD Bank was provided with the identities of 35 Illegal Payday Lenders by the New York State Department of Financial Services ("DFS"). In addition, Illegal Payday Loan

debits exhibit a unique pattern of activity on customers' deposit accounts and the ACH Network itself provides important information regarding Illegal Payday Lenders.

13.     Moreover, TD Bank maintains an in-house, a high-tech transaction surveillance software system and employs a large transaction monitoring employee group to identify suspicious or potentially unlawful transactions.   These in-house systems alerted TD Bank of the illegal activity at issue in this suit.

14.     In the face of this information, however, TD Bank continues to knowingly permit Illegal Payday Lenders to access its New York and Pennsylvania customers' deposit accounts.

15.     Because TD Bank repeatedly processed transactions initiated by Illegal Payday Lenders, TD Bank repeatedly collected illegal and usurious loan repayment debits from Plaintiffs and the Classes' TD Bank deposit accounts.   These illegal debits, in many instances, also caused a cascade of bank fees, further burying Plaintiffs and the Classes in massive holes of debt.   These revenue generating fees are a primary motivation for TD Bank's conduct.

## THE PARTIES

16.     Plaintiff David Andrichyn ("Andrichyn") is a resident of Lansdale, Pennsylvania. Andrichyn lives in a jurisdiction where payday loans are illegal but was offered an online loan by GR Enterprises.   Andrichyn is a banking customer of Defendant TD Bank.   As described more fully herein, TD Bank improperly and illegally processed debits from Andrichyn's account related to his Illegal Payday Loan.

17.     Plaintiff Gladstone Williams ("Williams") is a resident of Fresh Meadows, New York. Williams lives in a jurisdiction where payday loans are illegal but was offered online loans by companies doing business as JD Marketing Group, Hydra Financial Limited Fund III, EZPaydayCash, 500FastCash, Cash Jar, and 247GreenStreet.   Williams is a banking customer of

Defendant TD Bank.  As described more fully herein, TD Bank improperly and illegally processed debits from Williams's account related to his Illegal Payday Loans.

18.     TD Bank is a national banking association organized under the laws of the United States of America.  It maintains its principal place of business in Delaware.  Among other things, TD Bank is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative Classes.  TD Bank operates over 1,300 banking centers and conducts business in various states, including Pennsylvania and New York.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Classes is a resident of a different state than TD Bank.

20.     The Court has personal jurisdiction over TD Bank because TD Bank has purposefully availed itself of the privilege of conducting business activities in the State of Pennsylvania by advertising and selling its products and services within the State of Pennsylvania.  Additionally, TD Bank has maintained systematic and continuous business contacts with the State of Pennsylvania and is registered to conduct business in this State.

21.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because TD Bank is subject to personal jurisdiction here, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district, and because TD Bank has caused harm to one or more Plaintiffs residing in this District.

## COMMON FACTUAL ALLEGATIONS

**A.    State Laws Banning Payday Loans**

**Pennsylvania**

22.    Payday loans are unlawful in Pennsylvania.

23.    In Pennsylvania, where Plaintiff Andrichyn is a resident, the maximum lawful rate of interest that an unlicensed lender may charge for the loan or use of money in the amount of $50,000 or less is six percent (6%) per year.[1]

24.    The Consumer Discount Company Act ("CDCA") and the Loan Interest and Protection Law ("LIPL"), limit the amount of interest lenders may charge on loans under $25,000 and $50,000 respectively.  Section 201 of the LIPL states that the maximum lawful rate of interest an unlicensed lender may charge for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate, shall be six percent (6%) per annum.[2]  A person licensed by the Secretary of Banking of the Commonwealth of Pennsylvania pursuant to the CDCA is authorized to make loans of $25,000 or less under the rates, terms, and conditions contained in the CDCA, which can be up to approximately 24%.[3]

25.    41 P.S. § 502 permits a debtor to recover triple the interest (or other charges) paid in excess of the statutory cap.  Specifically, it states, "A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may

---

[1] Section 201 of the LIPL, 41 P.S. § 201.
[2] 41 P.S. § 201(a)
[3] 7 P.S. §§ 6213.E and 6217.1.A.

6

recover triple the amount of such excess interest or charges in a suit at law against the person **who has collected** such excess interest or charges . . . ."[4]

26.     TD Bank has repeatedly "collected" and taken monies for repayment of Illegal Payday Loans that feature interest significantly in excess of 6%.

27.     Moreover, 41 P.S. § 505 provides that "[a]ny person who knowingly and intentionally violates the provisions of this act shall be guilty of a misdemeanor of the third degree," and further that "[a]ny person who violates a provision of this act shall be subject to a fine levied by the department of ten thousand dollars ($10,000) per offense."

**New York**

28.     Payday loans are unlawful in New York.

29.     New York Banking Law § 14-a, subdivision 2, states that the maximum rate of interest to be **charged, taken, or received** upon a loan or forbearance of any money, goods, or things in action is sixteen percent per annum (16%) (emphasis added).

30.     Pursuant to New York Penal Law § 190.40 it is unlawful to knowingly charge, take, or receive any money or other property as interest on the loan or forbearance of any money or other property at a rate exceeding twenty-five per cent per annum (25%) or the equivalent rate for a longer or shorter period.

31.     TD Bank has repeatedly "charged, taken or received" monies for repayment of Illegal Payday Loans that equate to interest significantly in excess of 16%, and often in excess of 25%.

32.     New York law makes Illegal Payday Loan debts unenforceable, but TD Bank's conduct enforced them to the detriment of Plaintiff Williams and the New York Class.

_____

[4] 41 P.S. § 502 (emphasis added)

**B.**     **TD Bank's Standard Account Agreement**

33.     Plaintiffs and all members of the Classes currently hold, or formerly held, deposit accounts at TD Bank.  The terms of TD Bank's deposit accounts are contained in a standardized agreement (the "Account Agreement").

34.     The Account Agreement is attached as Exhibit A hereto.  On information and belief, as to the terms at issue, the Account Agreement was substantially the same throughout the Class Period.

35.     In relevant part, the Account Agreement requires customers to acknowledge and agree that TD Bank is "subject to the *Operating Rules and Guidelines of the National Automated Clearing House Association (NACHA) or the rules of any wire transfer system involved*" (emphasis added).

36.     TD Bank therefore incorporated NACHA Rules into its standardized Account Agreement, creating a contractual duty to customers to adhere to the NACHA Rules.

37.     Pursuant to the NACHA Rules, TD Bank had the due diligence and risk-based monitoring duties and obligations that are described below.  These duties required it not to process activity and debits from entities known to engage in unlawful activities, such as the Illegal Payday Lenders or their third party payment processors.

38.     The NACHA Rules also provide TD Bank with the authority to block transactions it knew were initiated by Illegal Payday Lenders.

39.     When reasonable due diligence and risk-based monitoring results in knowledge of unlawful activity, the NACHA Rules require RDFIs to prohibit or refuse to process those transactions.

8

40.     The NACHA Rules provide that an RDFI "must accept Entries that comply with these Rules and are received with respect to an account maintained with that RDFI, *subject to its right to return Entries under these Rules*."[5]

41.     The NACHA Rules provide that "[a]n RDFI *must* recredit the accountholder for a debit Entry that was, in whole or in part, not properly authorized under these Rules, as required by these Rules, applicable Legal Requirements, or agreement between the RDFI and the accountholder."[6] "Legal Requirements" are defined as "any law, statute, rule or regulation, or any binding published interpretation of any of the foregoing, issued by any government authority (including courts), and any judicial, governmental, or administrative order, judgment, decree or ruling . . ."[7]

42.     TD Bank's decision to process ACH debit entries that were in violation of the applicable "Legal Requirements," including the laws of Pennsylvania and New York, obligated TD Bank to re-credit the accounts of its customers it wrongfully debited for Illegal Payday Loans.

43.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Payday Lenders), an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.[8]

44.     Indeed, the Account Agreement also provided TD Bank with the authority to block transactions initiated by Illegal Payday Lenders.  It states: "In the event we identify a suspected restricted transaction, we may block or otherwise prevent or prohibit such transaction."

---

[5] NACHA Rule 3.1-3.1.1 (emphasis added).
[6] NACHA Rule 3.11.
[7] NACHA Rule 8.49 (emphasis added).
[8] NACHA 2013 Operating Rules Section 2.3, Subsection 2.3.2.3(b), p. OR6

In the case of the Illegal Payday Loan transactions described herein, however, TD Bank used this contractual authority to approve and process Illegal Payday Loan transactions.

45.     Also in violation of the Account Agreement, TD Bank charged bank overdraft and/or returned item fees as a result of unlawful Illegal Payday Loan debits.

46.     The Account Agreement does not authorize, expressly or impliedly, TD Bank to assess overdraft and/or returned item fees generated as a result of illegal and unenforceable transactions such as the Illegal Payday Loan transactions it had the contractual obligation not to process.

47.     TD Bank repeatedly processed Illegal Payday Loan transactions, despite NACHA Rules requiring the bank to monitor for and reject such transactions.  By doing this, TD Bank increased the amount of overdraft and/or returned item fee revenue it could gain from its customers.

48.     TD Bank unilaterally debits Illegal Payday Loan payments its customers deposit bank accounts, without providing its customers the ability to question, reject, or dispute the debit. Many debits occur in amounts far exceeding the reasonable understanding and expectations of borrowers, and cause significant externalities in the form of overdraft and/or returned item fees charged by TD Bank.

**C.     New York State Provided TD Bank With Specific Information Regarding Certain of Plaintiffs' Illegal Payday Lenders, and TD Bank Ignored It**

49.     On August 5, 2013, New York's DFS, which supervises banking and financial institutions in the State of New York, sent letters to 117 banks, including TD Bank, urging these banks to block online lenders from debiting their customers' deposit accounts. DFS specifically

informed NACHA and these banks of the identities of 35 such Illegal Payday Lenders that may attempt to use banks as conduits for illegal conduct.[9]

50.     The letter informed TD Bank that "[t]he Department has uncovered dozens of out-of-state lenders who have used the Internet to solicit and provide illegal payday loans to consumers in New York."[10]

51.     It went on to explain that in order "[t]o address their unlawful activity, DFS [ ] sent letters to 35 payday lenders directing them to cease and desist offering to lend and lending monies at usurious rates in New York."

52.     The letter also stated, "Banks have proven to be . . . an essential cog in the vicious machinery that these purveyors of predatory loans use to do an end-run around [the] law."

53.     The DFS letter informed TD Bank of the identities of 35 Illegal Payday Lenders that were sent cease and desist orders, including Illegal Payday Lenders such as EZPaydayCash and Cash Jar.   However, TD Bank has continued to process Illegal Payday Loan debits associated with these companies.

54.     For example, even *after* DFS provided the identities of Illegal Payday Lenders such as EZPaydayCash and Cash Jar, TD Bank continued to debit its customers' accounts for EZPaydayCash and Cash Jar Illegal Payday Loans.

**D.     TD Bank Actively Monitors ACH Transactions and Was Aware of Other Illegal Payday Loan Activity**

---

[9] Letter from Benjamin M. Lawsky to Janet O. Estep, President and CEO of NACHA, *Illegal Online Payday Loans Offered and Sold to New York Consumers* (Aug. 5, 2013), http://www.dfs.ny.gov/ about/press2013/pr130806-link2.pdf; Press Release, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans that Harm New York Consumers* (Aug. 6, 2013), http://www.dfs.ny.gov/about/press2013/pr1308061.htm.
[10] *Id.*

55.     Due to various obligations under federal law, NACHA Rules, and ACH Network rules, TD Bank is actively engaged in monitoring its ACH transaction flows for unlawful transactions and transactions initiated by merchants known or suspected to be engaged in illegal activities.

56.     Pursuant to federal statutes and regulations, TD Bank is obligated to have effective procedures to prevent entities engaged in unlawful activity from accessing the national banking system.   TD Bank is required to acquire information sufficient to know the true identities of the entities to which it provides access to the national banking system, as well as the nature of their business activities.

57.     For example, TD Bank, like all banks in the United States, is required by law to have an effective program in place to assure that it understands the identities of its merchants and the nature of their business activities.   Similarly, TD Bank is required to have an effective compliance program to prevent illegal use of the banking system by the Bank's merchants.[11]

58.     The Office of the Comptroller of the Currency ("OCC"), which regulates national banks, has specifically counseled banks to maintain a high awareness for potential illegal activity.

59.     On September 1, 2006, the OCC provided guidance for all national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."[12]   The OCC guidance advised:

---

[11] *See generally* Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; USA Patriot Act, § 326, 31 U.S.C. § 5318; 31 C.F.R. § 1020 *et seq.* (formerly 31 C.F.R. § 103 *et seq.*).
[12] OCC Bulletin 2006-39, *Automated Clearing House Activities* (Sept. 1, 2006), http://www.occ.gov/news-issuances/bulletins/2006/bulletin-2006-39.html.

**High-Risk Activities**

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. *Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders*.[13]

60.    In a footnote to the guidance, the OCC made the risk to banks even clearer: "Risks may include the risk of legal liability or damage to an institution's reputation when originators or third-party senders facilitate or engage in activities that violate criminal laws."[14]

61.    Moreover, as discussed below, the ACH Network (of which TD Bank is a member) has had, at all relevant times, its own requirements for risk-based transaction monitoring and due diligence.   That ACH Network also provided TD Bank additional information with which to identify transactions initiated by Illegal Payday Lenders.

62.    It is for all these reasons that TD Bank maintains a sophisticated in-house transaction monitoring operation, utilizing dedicated technology and staffing focused on transaction monitoring to ensure effective compliance with all regulatory bodies.

63.    As a result of the extensive merchant and transaction monitoring that TD Bank necessarily undertakes as a part of its normal business operations, TD Bank was and is aware of the Illegal Payday Loan activity it was processing on its customers' deposit accounts.

_____

[13] *Id.* (emphasis added)
[14] *Id.*

13

**E.**     **Pursuant to NACHA Rules, TD Bank Monitors Its Accounts for Illegal Activity**

64.     In the ACH Network, RDFIs have specific duties and obligations to combat unlawful transactions.

65.     In particular, the NACHA Rules govern every member of the ACH Network and are structured around the independent obligations of Originating Depository Financial Institutions ("ODFIs") and RDFIs: "The [NACHA] Rules are organized around the types of participants in the ACH Network and acknowledge the major roles played by originating and receiving financial institutions [and] therefore dedicate large sections to each of these roles."[15]

66.     The premise of the NACHA Rules is clear: RDFIs have the ability and duty to detect patterns of unauthorized transactions.

67.     First, the NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.   These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

68.     In addition, the NACHA Rules require participants in the ACH system to perform risk-based due diligence and monitoring for unlawful transactions and merchants.   The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and and various forms of financial abuse have found their way into every facet of the U.S. payment systems.   The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users.   Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to ***detect and prevent fraud and abusive financial transactions*** (emphasis added).[16]

---

[15] *NACHA Operating Rules & Guidelines* (Corporate ed., 2013), Introduction.
[16] *NACHA Operating Rules & Guidelines* (Corporate ed., 2013), NACHA Board of Directors Policy Statements ORii.

69.     The NACHA Rules require all RDFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "1) assessing the nature of risks associated with ACH activity; 2) performing appropriate know-your-customer due diligence; 3) establishing controls for Originators, third parties, and direct-access to ACH Operator relationships, and 4) having adequate management, information and reporting systems to monitor and mitigate risk."[17]

70.     In a March 14, 2013, operations bulletin, which interpreted the NACHA Rules, NACHA stated that "RDFIs *that detect a pattern of unauthorized transactions from a single Originator*, or that have customers that experience *unauthorized debit activity*, can contact the ODFI(s) for additional information, their Regional Payments Association for guidance, and also can use NACHA's National System of Fines to pursue an action against the ODFI(s)."[18]

71.     It is for all these reasons that TD Bank maintains a sophisticated in-house transaction monitoring operation, utilizing dedicated technology and staffing focused on transaction monitoring to ensure effective compliance with all regulatory bodies.

72.     As a result of the extensive merchant and transaction monitoring that TD Bank necessarily undertakes pursuant to its obligations in the ACH Network, TD Bank was aware of the Illegal Payday Loan activity it was processing on its customers' deposit accounts.

## F.      The ACH Network Provided TD Bank With Sufficient Information To Identify Illegal Payday Lenders and Loans

73.     The ACH Network provided TD Bank with information to identify Illegal Payday Lenders and Loans.

---

[17] *See Id.* at Ch. 4
[18] NACHA, ACH Operations Bulletin #2-2013, *High-Risk Originators and Questionable Debit Activity* (Mar. 14, 2014), available at http://thepaymentsauthority.s3.amazonaws.com/HighRiskOrig DebitActivity.March2013.pdf (emphasis added).

74.     First, for every ACH transaction, the Network provided TD Bank with the Originator[19] of the ACH entry, the location of the bank account of its customer, and the Receiver.[20]   Each Originator has a unique "Company Identification Number" that alerted TD Bank when either an Illegal Payday Lender was attempting to initiate a credit or debit entry to or from one of its customer's deposit accounts.

75.     Second, the Network provides other "red flags" that alerted TD Bank to the fact that unlawful activity was occurring. Chief among these "red flags" are historically excessive "return rates" on ACH credit or debit transactions initiated by the Originator (or third party payment processor),[21] which are coded under categories such as insufficient funds (code R01); authorization revoked by the customer (code R07); payment stopped by the customer (code R08); and/or customer advises debit is not authorized, improper, or ineligible (code R10). Credits or debits initiated by an originator (or third party payment processor) with historically high return rates under these categories alerted or should have alerted TD Bank to unlawful activity and at the very least, triggered TD Bank's obligation to request in writing from the ODFI a copy of the Receiver's authorization for each credit and debit entry initiated.

76.     On information and belief, ACH credits and debits originated on behalf of the Illegal Payday Lenders generated return rates far in excess of the average return rate for all electronic payments, which is well under 1%.

77.     Third, NACHA Rules require a debit entry to a consumer account originated based on an authorization that is communicated from the Receiver to the Originator via the

---

[19] An Originator is the entity that agrees to initiate the ACH entries into the payment system.  The Originator is usually a company directing a transfer of funds to or from a consumer's or another organization's account.
[20] A Receiver is the natural person or organization that the Originator is requesting the RDFI debit or credit via the ACH Network.
[21] Return rates are coded under categories such as insufficient funds (code R01), authorization revoked by the customer (code R07), payment stopped by the customer (code R08), and/or customer advises debit is not authorized, improper, or ineligible (code R10).

Internet to be coded as a "WEB" entry on the ACH transaction record.[22] NACHA Rules prescribe heightened vigilance with respect to WEB transactions.

78.     Plaintiffs and the members of the Classes' Illegal Payday Loan transactions were all WEB entries on the ACH network. This information alerted TD Bank to the possibility of Illegal Payday Loan transactions executed over the Internet.

79.     Indeed, NACHA has recognized that three unique characteristics of the Internet warranted the development of special operating rules for "WEB" transactions:

a.     The anonymity of the Internet environment in which parties are not certain with whom they are doing business poses unique opportunities for fraud;

b.     The Internet as an open network requires special security procedures to be deployed to prevent unauthorized access to Receiver financial information; and

c.     The sheer speed with which a large number of payments can be transacted over the Internet (volume and velocity).[23]

80.     Fourth, NACHA compiles and maintains a list of banned merchants engaged, or suspected to be engaged, in illegal activities called the Terminated Originator Database ("TOD"). The TOD regularly included Illegal Payday Lenders or third party payment processors operating on their behalf.

81.     Fifth, NACHA compiles and maintains a list of ACH originators and third-party processors that meet specified "high risk" criteria called the Originator Watch List ("OWL"). The OWL regularly included Illegal Payday Lenders or third party payment processors operating on their behalf.

---

[22] *See, e.g.*, 2013 NACHA Operating Rules Subsection 2.5.17.
[23] 2013 NACHA Operating Rules, Ch. 48, Internet Initiated/Mobile Entries (WEB).

82.     In sum, TD Bank was made aware of Illegal Payday Loans and Illegal Payday Lenders via the information provided to it by NACHA and through other means and had the duty and ability to prevent these illegal loans.

**G.    State And Federal Regulatory Agencies, Public Records, And Media Reports Alerted TD Bank To The Illegal Payday Lenders Unlawful Activities Across The Country And In The States Of Pennsylvania And New York**

**Pennsylvania**

83.     Pennsylvania has long been at the forefront of protecting its citizens from Illegal Payday Lenders.  As early as 2005, then Pennsylvania Attorney General Tom Corbett and Pennsylvania Banking Secretary Bill Schneck took legal action against Ace Pays Inc., finding that Ace Pays Inc., was charging "consumers more than 600% annual interest on loans."  Ace Pays Inc. was directed to pay fines and costs plus refund consumers the amount of interest they paid above the maximum 6% permitted under state law.

84.     On June 14, 2010, the Pennsylvania Department of Banking filed a Cease and Desist Order against Global Payday Loan, LLC a/k/a FastCash Advance a/k/a Payday-Loan-Yes, noting:

> Global Payday Loan, LLC a/k/a/ FastCash Advance a/k/a Payday-Loan-Yes is engaged in the business of lending money in an amount less than $25,000 to Pennsylvania residents and charging in excess of 6% simple interest per annum on loans, without a license, and attempts to collect and collects on such loans from Pennsylvania residents, and advertises and solicits such loans to Pennsylvania residents.

Additionally, the Cease and Desist Order noted that the company was "engaged in unlicensed activity in violation of the CDCA and LIPL" and "does business . . . on a website located at www.payday-loan-yes.com" and www.fastcashadvance.com.

85.     On February 24, 2011, the Pennsylvania Department of Banking published on its website, "The Truth About Payday Loans" to clearly inform banks and citizens that payday loans are illegal.  It informed banks and consumers that "no payday lender holds a Department of Banking license" thereby making any payday loan from such a company illegal under the Consumer Discount Company Act.  It also noted that "while payday loans may be advertised on television, radio and especially over the Internet as a reasonable option for people who need immediate cash, its potential pitfalls can spell financial disaster for borrowers."

86.     On June 26, 2013, the Commonwealth of Pennsylvania, acting through the Department of Banking and Securities Bureau of Compliance and Licensing, entered into a Consent Agreement and Order with Martin A. Webb, his company PayDay Financial, LLC, Western Sky Financial, LLC,  and Red Stone Financial, LLC.  The Consent Agreement and Order stated that these companies "without a license under the CDCA (Consumer Discount Company Act), negotiated or made loans in the amount of $25,000 or less to Pennsylvania residents, and collected and charged interest in amounts in excess of that permitted by the LIPL (Loan Interest Protection Law) and the CDCA."   Further, it ordered the companies to, *inter alia,* "cease and desist from making loans to Pennsylvania residents; cease and desist from collecting interest in excess of 6% on any outstanding loan from Pennsylvania residents; refund . . . any amount it collected that exceeded the principle plus 6% interest."

**New York**

87.     New York has also been at the forefront of protecting its citizens from Illegal Payday Lenders.

88.     As early as 1999, Elizabeth McCaul, then-Acting Superintendent of Banks for The Banking Department of the State of New York (predecessor to the New York Department of

Financial Services) issued an "All Institution" industry letter warning banks and other lenders that out-of-state companies may be making Illegal Payday Loans over the Internet, violating New York law.[24]

89.     In June of 2000, Elizabeth McCaul sent another industry letter again warning banks and consumers about Illegal Payday Loans.  The letter noted that the Banking Department contacted one company that had been offering payday loans in New York and secured the company's agreement to immediately stop taking applications for payday loans from New York State residents.[25]

90.     In 2004, the New York Attorney General took actions against four different Illegal Payday Lenders that had been making usurious loans to New York residents.  All four Illegal Payday Lenders ultimately agreed or were ordered by the court to stop making usurious payday loans in New York.  The Attorney General commented in his press release that "[p]ayday lending can be the modern equivalent of loan sharking and . . . this office [would] continue to take aggressive action to stop payday lenders from victimizing New York consumers."[26]

91.     In 2009, the New York Attorney General secured a $5.2 million settlement from two out of state Illegal Payday Lenders that agreed to provide refunds to the more than 14,000 New York consumers who were victimized as well as additional monies in penalties and costs.

92.     In February of 2013, Governor Cuomo announced that the Department of Financial Services ("DFS") sent letters to all debt collectors in New York stating that it is illegal to attempt to collect a debt on a payday loan since such loans are illegal in New York.  The

---

[24] Letter from Elizabeth McCaul, Acting Superintendent of Banks, *Payday Lenders* (June 29, 1999), http://www.dfs.ny.gov/legal/industry_circular/banking/il990629.htm.
[25] Letter from Elizabeth McCaul, Acting Superintendent of Banks, *Payday Loans* (June 30, 2000), http://www.dfs.ny.gov/legal/industry_circular/banking/il000613.htm.
[26] Press Release, *Payday Lender to Fogive Loans and Provide Refunds* (Nov. 22, 2004), http://www.ag.ny.gov/press-release/payday-lender-forgive-loans-and-provide-refunds.

letters stated, "[t]his notice is to remind all persons and entities collecting debts in New York that they should not seek to collect on illegal, usurious loans made in New York, including payday loans." It further noted, "This includes illegal, usurious payday loans made in New York over the Internet and via phone and mail."

93. In April of 2013, DFS came out in strong opposition to the payday loan industry's aggressive efforts to legalize unsafe payday loans in New York. In a letter to New York State Assembly Speaker Sheldon Silver, Superintendent Benjamin Lawsky noted that "New York has been a leader in protecting consumers from predatory short-term, high interest payday loans."

94. In August of 2013, the New York Attorney General filed a lawsuit against three Illegal Payday Lenders and their owners, alleging that they violated usury laws by making loans that carry annual interest rates of between 89% and 335%. It alleged that the three Illegal Payday Lenders made nearly 18,000 loans to New York borrowers totaling $38 million in principal since 2010, on which the borrowers owed more than $185 million in finance charges.

95. Also in August of 2013, The New York Times reported that "New York is widening its scrutiny [of Illegal Payday Loans] to include the banks that enable the lenders to operate." The New York Times noted that New York state officials recognized that "the banks . . . are a critical link between consumers and payday lenders [that] allow the lenders to automatically withdraw monthly loan payments from borrowers' checking accounts." It further noted that "the Manhattan district attorney's office [was also] investigating the banks for permitting illicit withdrawals from customer accounts."

**Federal Actions**

96. Currently, at least six federal agencies, including the U.S. Department of Justice ("DOJ"), the Consumer Protection Financial Bureau ("CPFB"), and the Federal Trade

Commission ("FTC"), are coordinating an extensive investigation regarding the online payday lending industry.

97.    To date, the Department of Justice has issued civil subpoenas to more than fifty financial companies, including banks and payment processors that connect borrowers with online lenders.[27] Michael Bresnick, a former federal prosecutor who heads the Financial Fraud Enforcement Task Force,[28] discussed the DOJ's subpoenas and stated that the banks that hold accounts for Illegal Payday Lenders are ignoring red flags and "aren't always blind to the fraud."[29]

98.    Also in 2013, it was announced that the FDIC had audited banks with relationships to Illegal Payday Lenders and told banks working with these lenders that these lenders posed a "'reputational risk that could harm the banks' safety and soundness."[30]

99.    The focus of these federal efforts is "whether banks have enabled online lenders to withdraw money illegally from borrowers' checking accounts in a bid to boost their own take from payment-processing fees and customer refund requests."[31]

100.    As a result of federal and state pressure, as well as private civil litigation instituted in the federal courts, banks have begun terminating their relationships with Illegal Payday Lenders. In a telling e-mail from an unnamed bank to an Illegal Payday Lender, the bank wrote, "[B]ased on your performance, there's no way we shouldn't be a credit provider. . . . Our

---

[27] Daniel Wagner, *Six Federal Agencies are Investigating Online Payday Lenders* (Cntr. For Public Integrity, Aug. 8, 2013), http://www.publicintegrity.org/2013/08/08/13145/six-federal-agencies-are-investigating-online-payday-lenders.
[28] The task force is led by the DOJ "and includes more than two dozen federal and state regulators and law enforcement entities." *Id.*
[29] *Id.*
[30] Carter Dougherty, *U.S. regulators Squeeze Banks to Cut Ties to Some Online Lenders* (Bloomberg, Aug. 9, 2013), http://www.bloomberg.com/news/2013-08-08/u-s-regulators-squeeze-online-lenders-via-bank-transfer-system.html.
[31] Danielle A. Douglas, *Banks to Payday Lenders: Quit the Business or We'll Close Your Account* (Washington Post, Apr. 11, 2014), http://www.washingtonpost.com/business/economy/banks-to-payday-lenders-quit-the-business-or-well-close-your-account/2014/04/11/afd34976-c0c6-11e3-bcec-b71ee10e9bc3_story.html.

only issue is, and it has always been, the space in which you operate. It is the scrutiny that you, and now that we, are under."[32]

## H.   Plaintiffs' Internet Payday Loans

### David Andrichyn

101.   On or about December 2, 2012, Plaintiff Andrichyn applied for and received a payday loan in the amount of $350.00 from GR Enterprises by completing an application on the www.signmyloan.net website

102.   The entirety of the interest plus principal, which equaled $455.00, was due 11 days from the date of the loan. Thus the nominal annual interest rate on the loan was at least 995.45%.

103.   On or about December 14, 2012, GR Enterprises initiated a debit transaction of $106.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network. The $106.00 payment was processed as a debit by TD Bank.  TD Bank allowed the debit of the account even though TD Bank knew that Andrichyn's account already showed a negative balance, causing Andrichyn's account to enter into a greater negative balance.  On or about December 17, 2013, Andrichyn's $106.00 debit was returned and a $35.00 overdraft fee was charged to Andrichyn's account by TD Bank.

104.   On or about December 19, 2012, GR Enterprises initiated another debit transaction of $106.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network.  The $106.00 payment was processed as a debit by TD Bank.  Again, TD Bank allowed the debit of the account even though TD Bank knew that Andrichyn's account already showed a negative balance, causing the Andrichyn's account to enter into a greater negative

---

[32] *Id.*

balance. On or about December 20, 2013, Andrichyn's $106.00 debit was returned and another $35.00 overdraft fee was charged to Andrichyn's account by TD Bank.

105.     On or about December 24, 2012, GR Enterprises initiated another debit transaction of $106.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network.  The $106.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $106.00 from Andrichyn's account.  The $106.00 was applied solely to interest and fees and did not reduce the amount of Andrichyn's $350.00 debt.

106.     On or about December 28, 2012, GR Enterprises initiated a debit transaction of $106.00 from Andrichyn's TD Bank checking account in Pennsylvania through the ACH Network.  The $106.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $106.00 from Andrichyn's account.  The $106.00 was applied solely to interest and fees and did not reduce the amount of Andrichyn's $350.00 debt.

107.     On or about January 11, 2013, GR Enterprises initiated a debit transaction of $106.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network. The $106.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $106.00 from Andrichyn's account.

108.     On or about January 25, 2013, GR Enterprises initiated a debit transaction of $106.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network. The $106.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $106.00 from Andrichyn's account.

109.     On or about February 8, 2013, GR Enterprises initiated a debit transaction of $175.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network.

The $175.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $175.00 from Andrichyn's account.

110.     Also on February 8, 2013, GR Enterprises initiated another debit transaction in the amount of $106.00 from Andrichyn's TD Bank deposit account in Pennsylvania through the ACH Network.   The $106.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $106.00 from Andrichyn's account.   Accordingly, this debit resulted in Andrichyn as of February 8, 2013, having payments totaling $705.00 taken from his account by TD Bank at the request of Illegal Payday Lender GR Enterprises.

111.     As detailed *supra*, GR Enterprises' frequent debits on Andrichyn's deposit account with TD Bank caused Andrichyn's account to enter into a negative balance on multiple occasions.   Consequently, TD Bank charged Andrichyn multiple overdraft fees at the time of or shortly after processing GR Enterprises debits, further harming Andrichyn.

**Gladstone Williams**

112.     On or about April 18, 2013, Plaintiff Williams applied for and received a payday loan in the amount of $300.00 from JD Marketing Group by completing an application over the Internet.

113.     The entirety of the interest plus principal, which equaled $390.00, was due 12 days from the date of the loan.   Thus, the nominal annual interest on the loan was at least 995.45%.

114.     On or about May 15, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.   The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from

Williams's account.  The payment applied solely to interest and did not reduce the amount of Williams's $300.00 debt.

115.    On or about May 31, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.  The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

116.    On our about June 17, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.  The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

117.    On or about July 1, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.  The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

118.    On or about July 15, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.  The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

119.    On or about July 31, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.  The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

120.   JD Marketing Group's frequent debits of Williams's deposit account with TD Bank caused Williams's account to enter into a negative balance.   Consequently, TD Bank charged Williams overdraft fees at the time of or shortly after processing JD Marketing Group's debits.

121.   For example, on May 31, 2013, JD Marketing Group initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York.   The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account. As a result Williams was charged by and paid to TD Bank, an overdraft fee of $35.00 on June 4, 2013.

122.   On or about May 10, 2013, Williams applied for and received a payday loan in the amount of $300.00 from Hydra Financial Limited Fund III ("Hydra"), by completing an application on the company's website.

123.   The entirety of the interest plus principal, which equaled $390.00, was due 5 days from the date of the loan.   Thus, the nominal annual percentage rate on the loan was at least 730%.

124.   On or about May 15, 2013, Hydra initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.   The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

125.   On or May 31, 2013, Hydra initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network.   The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

126. On or about June 14, 2013, Hydra initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network. The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

127. On or about July 1, 2013, Hydra initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York through the ACH Network. The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account.

128. Hydra's frequent debits of Williams's deposit account with TD Bank caused Williams's account to enter into a negative balance. Consequently, TD Bank charged Williams overdraft fees at the time of or shortly after processing Hydra's debits.

129. For example, on July 15, 2013, Hydra initiated a debit transaction of $90.00 from Williams's TD Bank deposit account in New York. The $90.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $90.00 from Williams's account. Williams's deposit account was charged by and paid to TD Bank, an overdraft fee of $35.00 on July 23, 2013.

130. On or about June 27, 2013, Williams applied for and received a payday loan in the amount of $400.00 from EZPaydayCash, by completing an application over the Internet.

131. The nominal annual percentage rate on the loan was at least 500%.

132. On or about July 15, 2013, EZPaydayCash, initiated a debit transaction of $120.00 from Williams's TD Bank deposit account in New York through the ACH Network. The $120.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $120.00

from Williams's account. The $120.00 payment was applied solely to interest and did not reduce the amount of Williams's $400.00 debt.

133.    On or about July 31, 2013, EZPaydayCash initiated a debit transaction of $120.00 from Williams's TD Bank deposit account in New York through the ACH Network.   The $120.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $120.00 from Williams's account.   The $120.00 payment was applied solely to interest and did not reduce the amount of Williams's $400.00 debt.

134.    On or about August 15, 2013**, approximately 10 days after TD Bank received the August 5, 2013, letter from DFS identifying EZPaydayCash as an Illegal Payday Lender that attempts to use banks in New York as conduits for transacting and collecting monies related to Illegal Payday Loans, TD Bank continued to process debits for EZPaydayCash and take monies from Williams's account**. Specifically, on August 15, 2013, EZPaydayCash initiated a debit transaction of $120.00 from Williams's TD Bank deposit account in New York through the ACH Network.   The $120.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $120.00 from Williams's account.   TD Bank took these monies from Williams's account despite knowing that EZPaydayCash was an Illegal Payday Lender that issued Illegal Payday Loans; and despite knowing that EZPaydayCash was ordered to cease and desist transactions in New York.

135.    On or about June 13, 2013, Williams applied for and received a payday loan in the amount of $350.00 from 500FastCash, by completing an application on the www.500fastcash.com website.

136. The entirety of the interest plus principal, which equaled $1,100.00 was due 124 days from the date of the loan. Thus, the nominal annual percentage rate on the loan was at least 720%.

137. On or about June 28, 2013, 500FastCash initiated a debit transaction of $105.00 from Williams's TD Bank deposit account in New York through the ACH Network. The $105.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $105.00 from Williams's account. The payment applied solely to interest and did not reduce the amount of Williams's $350.00 debt.

138. On or about July 15, 2013, 500FastCash initiated a debit transaction of $105.00 from Williams's TD Bank deposit account in New York through the ACH Network. The $105.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $105.00 from Williams's account. The payment applied solely to interest and did not reduce the amount of Williams's $350.00 debt.

139. On or about July 31, 2013, 500FastCash initiated a debit transaction of $105.00 from Williams's TD Bank deposit account in New York through the ACH Network. The $105.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $105.00 from Williams's account. The payment applied solely to interest and did not reduce the amount of Williams's $350.00 debt.

140. On or about April 22, 2013, Williams applied for and received a payday loan in the amount of $450.00 from Cash Jar, by completing an application over the Internet.

141. The nominal annual percentage rate on the loan was at least 100%.

142. On or about May 15, 2013, Cash Jar initiated a debit transaction of $112.50 from Williams's TD Bank deposit account in New York through the ACH Network. The $112.50

payment was processed as a debit by TD Bank resulting in TD Bank taking $112.50 from Williams's account.

143.    On or about May 31, 2013, Cash Jar initiated a debit transaction of $112.50 from Williams's TD Bank deposit account in New York through the ACH Network.  The $112.50 payment was processed as a debit by TD Bank resulting in TD Bank taking $112.50 from Williams's account.

144.    On or about June 14, 2013, Cash Jar initiated a debit transaction of $112.50 from Williams's TD Bank deposit account in New York through the ACH Network.  The $112.50 payment was processed as a debit by TD Bank resulting in TD Bank taking $112.50 from Williams's account.

145.    On or about June 28, 2013, Cash Jar initiated a debit transaction of $162.50 from Williams's TD Bank deposit account in New York through the ACH Network.  The $162.50 payment was processed as a debit by TD Bank resulting in TD Bank taking $162.50 from Williams's account.

146.    On or about July 15, 2013, Cash Jar initiated a debit transaction of $150.00 from Williams's TD Bank deposit account in New York through the ACH Network.  The $150.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $150.00 from Williams's account.

147.    On or about July 31, 2013, Cash Jar initiated a debit transaction of $137.50 from Williams's TD Bank deposit account in New York through the ACH Network.  The $137.50 payment was processed as a debit by TD Bank resulting in TD Bank taking $137.50 from Williams's account.

148.   On or about August 15, 2013, *approximately 10 days after TD Bank received the August 5, 2013, letter from DFS identifying Cash Jar as an Illegal Payday Lender that attempts to use banks as conduits for transacting and collecting monies related to Illegal Payday Loans, TD Bank continued to process debits for Cash Jar and take monies from Williams's account.* Specifically, on August 15, 2013, Cash Jar initiated a debit transaction of $125.00 from Williams's TD Bank deposit account in New York through the ACH network. The $125.00 payment was processed as a debit by TD Bank resulting in TD Bank taking $125.00 from Williams's account.   TD Bank took these monies from Williams's account despite knowing that Cash Jar was an Illegal Payday Lender that issued Illegal Payday Loans; and despite knowing that Cash Jar was ordered to cease and desist transactions in New York.

149.   On or about August 1, 2013, Williams applied for and received a payday loan in the amount of $1,120.00 from 247GreenStreet by completing an application over the Internet.

150.   The entirety of the interest plus principal, which equaled $1,377.38 was due 14 days from the date of the loan.  Thus, the nominal annual interest on the loan was at least 366%.

151.   On or about August 15, 2013, TD Bank processed a debit for 247GreenStreet and took monies from Williams's account.  Specifically, TD Bank initiated a debit transaction of $1,377.38 from Williams's deposit account in New York through the ACH Network.   The $1,377.38 payment was processed as a debit by TD Bank resulting in TD Bank taking $1,377.38 from Williams's account.

## CLASS ACTION ALLEGATIONS

152.   Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(3).   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

153.    The Pennsylvania Class is defined as:

> All TD Bank account holders in Pennsylvania whose accounts, within the last six (6) years preceding the filing of this action to the date of class certification, were debited for Illegal Payday Loans.

154.    The New York Class is defined as:

> All TD Bank account holders in New York whose accounts, within the last six (6) years preceding the filing of this action to the date of class certification, were debited for Illegal Payday Loans.

155.    Excluded from each Class is Defendant; its parents, subsidiaries, affiliates, officers and directors; any entity in which Defendant has a controlling interest; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

156.    <u>Numerosity</u>.    The members of the Classes are so numerous that joinder is impractical.    The Classes consist of thousands of members, whose identities are within the knowledge of and can be ascertained only by resort to Defendant's records.

157.    <u>Typicality</u>. The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in that they had their deposit accounts depleted by Illegal Payday Loan payments and have been assessed unlawful or deceptive bank fees.  Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

158.   <u>Commonality/Predominance</u>.   There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

159.   Among the questions of law and fact common to the Classes are whether Defendant:

a.   Whether TD Bank violated various state consumer protection statutes by participating in a scheme to flout state laws banning payday loans;

b.   Whether TD Bank breached the contract it has with members of the Classes;

c.   Whether TD Bank was unjustly enriched as a result of overdraft and returned item fees it assessed on accounts as a result of debits made on behalf of Illegal Payday Lenders;

d.   Whether TD Bank maintained unconscionable policies and procedures; and

e.   Whether TD Bank violated the NACHA Rules.

160.   Other questions of law and fact common to the Classes include:

a.   The proper method or methods by which to measure damages; and

b.   The injunctive and declaratory relief to which the Classes are entitled.

161.   <u>Adequacy</u>.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

162.   <u>Superiority</u>.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of

Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

163. Even if members of the Classes themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

<u>**FIRST CLAIM FOR RELIEF**</u>
<u>**BREACH OF CONTRACT**</u>
**(on Behalf of the Classes)**

164. Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

165. Plaintiffs and TD Bank have contracted for bank account deposit, ATM, and debit card services, as embodied in TD Bank's Account Agreement and related documentation.

166. The Account Agreement incorporated NACHA Rules, promising accountholders that all ACH transactions would be processed strictly in accordance with the ACH Network's rules and procedures.

167. Those NACHA Rules, in turn, require TD Bank to block transactions it knows to be unlawful or unauthorized under NACHA rules.

168.   The Account Agreement separately provided TD Bank with the contractual obligation to block transactions it knew or believed to be unlawful.

169.   TD Bank breached its contractual promise to process all ACH transactions in accordance with the NACHA Rules when it processed Illegal Payday Loan transactions it knew ot be unlawful.

170.   The Illegal Payday Loan debits also caused Plaintiffs and the Classes deposit accounts to incur overdraft and/or returned item fees that would not have been assessed without TD Bank's improper debits for Illegal Payday Loan payments.

171.   These fees were in violation of the Account Agreement, which did not allow TD Bank to assess fees on transactions that were unlawful or unauthorized under NACHA Rules.

172.   Plaintiffs and the members of the Classes have sustained damages as a result of TD Bank's breach of contract.

**SECOND CLAIM FOR RELIEF**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(on Behalf of the Classes)**

173.   Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

174.   TD Bank violated the covenant of good faith and fair dealing when it used its discretion to process or refuse to process debits to repeatedly and in bad faith process transactions it knew were unlawful and/or in violation of NACHA Rules.

175.   Under the laws of Pennsylvania and New York good faith is an element of every contract pertaining to the assessment of overdraft and returned item fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance

and other duties according to their terms, means preserving the spirit not merely the letter of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

176. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

177. TD Bank has breached the covenant of good faith and fair dealing in the Account Agreement through a) its processing of transactions it knew were illegal and initiated by Illegal Payday Lenders; and b) its imposition of overdraft and/or returned item fees generated as a result of it's honoring illegal and unenforceable transactions on Illegal Payday Loans.

178. Plaintiffs and members of the Classes have sustained damages as a result of TD Bank's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
### UNCONSCIONABILITY
**(On Behalf of the Classes)**

179. Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

180. TD Bank's policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

      a.    TD Bank did not disclose or reasonably disclose to customers that it would charge overdraft and returned item fees generated solely as a result of its honoring of illegal and unenforceable transactions on Illegal Payday Loans;

b.      TD Bank did not obtain affirmative consent from Plaintiffs and the members of the Classes prior to processing an illegal and unenforceable transaction on Illegal Payday Loans that would overdraw the account and result in the imposition of an overdraft or returned item fee;

c.      TD Bank did not alert Plaintiffs and the members of the Classes that an illegal and unenforceable transaction on Illegal Payday Loans would overdraw the account and result in the imposition of an overdraft and/or returned item fee;

d.      The Account Agreement and related documents, are contracts of adhesion in that they are standardized forms, imposed and drafted by TD Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement it its entirety;

e.      The Account Agreement provided to customers is ineffective, ambiguous, deceptive, unfair and misleading in that it does not unambiguously state that TD Bank always charges overdraft and returned item fees generated as a result of TD Bank's honoring illegal and unenforceable transactions on Illegal Payday Loans.

181.    Considering the great business acumen and experience of TD Bank in relation to Plaintiffs and the Classes, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

182.    The imposition of overdraft and/or returned item fees generated solely as a result of TD Bank's honoring illegal and unenforceable transactions on Illegal Payday Loans is itself unconscionable.

183.    Plaintiffs and members of the Classes have sustained damages as a result of TD Bank's unconscionable policies and practices as alleged herein.

**FOURTH CLAIM FOR RELIEF**
**CONVERSION**
**(On Behalf of the Classes)**

184.    Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

185.    TD Bank had and continues to have a duty to maintain and preserve its customers' deposit accounts and to prevent their diminishment through its own wrongful acts or wrongful acts of others.

186.    TD Bank has wrongfully collected overdraft and/or returned item fees from Plaintiffs and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

187.    TD Bank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Classes, without legal justification.

188.    TD Bank continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Classes.

189.    TD Bank intends to permanently deprive Plaintiffs and the members of the Classes of these funds.

190.    These funds are properly owned by Plaintiffs and the members of the Classes, not TD Bank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the Classes.

191.    Plaintiffs and the members of the Classes are entitled to the immediate possession of these funds.

192.    TD Bank has wrongfully converted these specific and readily identifiable funds.

193.    TD Bank's wrongful conduct is continuing.

194.    As a direct and proximate result of this wrongful conversion, Plaintiffs and members of the Classes have suffered and continue to suffer damages.

195.    By reason of the foregoing , Plaintiffs and the members of the Classes are entitled to recover from TD Bank all damages and costs permitted by law, including all amounts that TD Bank has wrongfully converted.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT (IN THE ALTERNATIVE)**
**(On Behalf of the Classes)**

196.    Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

197.    Plaintiffs, on behalf of themselves and the members of the Classes, assert a common law claim for unjust enrichment.

198.    By means of TD Bank's wrongful conduct alleged herein, TD Bank knowingly provides banking services to Plaintiffs and members of the Classes that are unfair, unconscionable, and oppressive.

199.    TD Bank knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes.  In so doing, TD Bank acted with conscious disregard for the rights of the Plaintiffs and members of the Classes.

200.    As a result of TD Bank's wrongful conduct as alleged herein, TD Bank has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

201.    TD Bank's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

202. Under the common law doctrine of unjust enrichment, it is inequitable for TD Bank to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft and returned item fees on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner. TD Bank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

203. The financial benefits derived by TD Bank rightfully belong to Plaintiffs and members of the Classes. TD Bank should be compelled to disgorge in a common fund for the benefit of the Plaintiffs and the members of the Classes all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by TD Bank traceable to Plaintiffs and the members of the Classes.

204. Plaintiffs and members of the Classes have no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW 73 P.S. §§ 201 _et seq._**
**(On Behalf of the Pennsylvania Class)**

205. Plaintiff Andrichyn re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

206. Pursuant to 73 P.S. § 201-2(4)(xxi), it is unlawful to engage in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

207. At all times relevant hereto, Andrichyn and members of the Pennsylvania Class were "persons" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

208. TD Bank has engaged and continues to engage in deceptive business practices in violation of 73 P.S. § 201-2(4)(xxi), including, _inter alia_:

a.    Violating the public policy of the State of Pennsylvania by processing debits on Illegal Payday Loans.

b.    Representing that it would act in accordance with NACHA Rules and not process illegal transactions, when in fact it did not.

c.    Repeatedly processing illegal transactions despite rules and laws requiring it to monitor and reject such transactions.

d.    Repeatedly charging overdraft and/or returned item fees as a result of illegal transactions, despite a contract that does not expressly or impliedly allow for such fees.

209.    Pursuant to 73 P.S. § 201-4.1 Andrichyn and the members of the Pennsylvania Class seek injunctive relief, restitution, damages, and penalties.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF NEW YORK GBL §§ 349 *et seq.*
### (On Behalf of the New York Class)

210.    Plaintiff Williams re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

211.    Pursuant to GBL § 349, it is unlawful to engage in any deceptive acts or practices in the conduct of any business, trade, or commerce in this State.

212.    TD Bank has engaged and continues to engage in deceptive business practices in violation of GBL § 349, including, *inter alia*:

a.    Violating the public policy of the State of New York by processing debits on Illegal Payday Loans.

b.    Representing that it would act in accordance with NACHA Rules and not process illegal transactions, when in fact it did not.

c.    Repeatedly processing illegal transactions despite rules and laws requiring the bank to monitor and reject such transactions.

d.    Repeatedly charging overdraft or returned item fees as a result of illegal transactions, despite a contract that does not expressly or impliedly allow for such fees.

213.    Pursuant to GBL §§ 349 and 350-d, Plaintiff Williams and the members of the New York Class seek injunctive, relief, restitution, damages, and penalties.

## JURY DEMAND

Plaintiffs and the members of the Classes demand a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Classes demand judgment as follows:

1.    Declaring TD Bank's ACH policies and practices to be wrongful, unfair and unconscionable and providing appropriate injunctive relief;

2.    Actual damages in an amount according to proof;

3.    Restitution of all bank fees paid to TD Bank by Plaintiffs and members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

4.    Disgorgement of the ill-gotten gains derived by TD Bank from its misconduct;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the maximum rate permitted by applicable law;

7.    Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.    Such other relief as this Court deems just and proper.

Dated:  June 23, 2014                           Respectfully submitted,


                                                *Brent W Landau*

                                                Brent W. Landau (PA Bar No. 202189)
                                                **HAUSFELD LLP**
                                                1604 Locust St., 2nd floor
                                                Philadelphia, PA 19103
                                                Tel:    (215) 985-3273
                                                Fax:    (215) 985-3271
                                                blandau@hausfeldllp.com

43

James J. Pizzirusso
Nathaniel C. Giddings
1700 K Street NW
Suite 650
Washington, D.C. 20006
Tel:     (202) 540-7200
Fax:     (202) 540-7201
jpizzirusso@hausfeldllp.com
ngiddings@hausfeldllp.com

**GRANT & EISENHOFER P.A.**
Daniel L. Berger
485 Lexington Avenue
New York, NY 10017
Tel:     (646) 722-8522
Fax:     (646) 722-8501
dberger@gelaw.com

Raymond Francis Schuenemann III (PA Bar No.
203017)
123 Justison St
Wilmington, DE 19801
Tel:     (302) 622-7000
Fax:     (302) 622-7100
rschuenemann@gelaw.com

Adam J. Levitt
30 North LaSalle Street, Suite 1200
Chicago, IL 60602
Tel:     (312) 214-0000
Fax:     (312) 214-0001
alevitt@gelaw.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei
Jeffrey D. Kaliel
Anna C. Haac
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel:     (202) 973-0900
Fax:     (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

44

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel
Steve Six
J. Austin Moore
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:    (816) 714-7100
Fax:    (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**CHITWOOD HARLEY HARNES LLP**
Darren T. Kaplan
1350 Broadway, Suite 908
New York, NY 10018
Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow
Jason H. Alperstein
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel:    (954) 525-4100
Fax:    (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

*Counsel for Plaintiffs and the Classes*

# EXHIBIT A

# Personal Deposit Account Agreement



**America's Most Convenient Bank®**

This is an important document. It contains the contract governing your deposit relationship with the Bank and required legal disclosures. Please have it translated.

Éste es un documento importante.Contiene el contrato que gobierna su relación de depósitos con el Banco y declaraciones requeridas por ley.Por favor, mande a hacer la traducción de este documento.

Ce document est important.Il contient le contrat éxecutant votre rapport de versement avec la Banque et les publications légales. Veuillez le faire traduire s'il-vous-plaît.

Este é um documento importante.Ele contém o contrato que governa a sua relação de depósitos com o banco e declarações requeridas por lei.Por favor traduza.

هذه وثيقة هامة تحتوى على عقد يحكم علاقتكم الإيداعية مع البنك والكشوفات المطلوبة قانونيا. الرجاء ترجمتها.

這是一份重要文件。其中包含有關您與銀行之間存款關係的合約，以及所需的法律披露事宜。請翻譯此文件。

"នេះជាឯកសារមួយយ៉ាងសំណាល់ ។ ឯកសារនេះមានពត៌មានស្ដីពីកិច្ចសន្យាគ្រប់គ្រងលើ ទំនាក់ទំនងឯកសារកក្កុលករបស់អ្នកជាមួយយនឯាការ ហើយឯ្យ៉ាងៗមានឯការបញ្ចេញពត៌មាន ស្របច្បាប់ ។ សូមឧ្យេចេបក្ដ្រែ្របឯកសារនេះ "

Ini adalah dokumen penting. Dokumen ini berisi kontrak yang mengatur hubungan simpanan Anda dengan Bank dan ketentuan dan persyaratan yang dibutuhkan. Silakan diterjemahkan.

본 문서는 중요합니다. 여기에는 은행과의 예금관계 계약과 법적으로 요구되는 공시가 살려있습니다. 본 문서를 번역 하시기 바랍니다.

Это важный документ. Он включает в себя контракт, регулирующий внесение депозитных вкладов на счета, содержащиеся в нашем банке, а также юридический порядок предоставления информации о счетах. Пожалуйста, попросите, чтобы этот документ перевели для вас.

" Đây là tài liệu quan trọng. Tài liệu này bao gồm hợp đồng chi phối tương quan giữa việc ký thác tiền bạc của quý vị với Ngân Hàng và sự tiết lộ nội dung hoạt động theo đòi hỏi của pháp luật. Vui lòng nhờ dịch tài liệu này sang tiếng Việt để hiểu rõ."

# Welcome to TD Bank, America's Most Convenient Bank®

We are pleased to offer you this Personal Deposit Account Agreement ("Agreement") that governs the terms and conditions of your personal deposit account(s) with us. This Agreement consists of Parts I-VI below, as well as the Rate Sheet(s), Personal Fee Schedule(s) and Account Maintenance Information grid(s) published by the Bank from time to time. This Agreement provides you with information you will want to know about your personal deposit account(s). If you have any questions, or would like to learn more about our personal deposit account products and services, please contact any of our Stores or call us at **1-888-751-9000**. We will be happy to assist you.

**Topic**                                            **Starts at Page #**

**Part I:**
Personal Deposit Account Terms and Conditions ....................2

**Part II:**
Truth in Savings Disclosure .................................................25

**Part III:**
Funds Availability Policy ....................................................34

**Part IV:**
Electronic Funds Transfers Disclosure................................38

**Part V:**
Substitute Check Disclosure...............................................46

**Part VI:**
Night Depository Agreement..............................................47

## Definitions

Throughout this Agreement, unless otherwise indicated, the following words have the meanings given to them below:

a) **"Account"** means your Checking Account, Money Market Account, personal CD Account and/or Savings Account with us, as applicable, unless limited by the heading under which it appears.

b) **"Business Day"** means every day, except Saturdays, Sundays, and federal holidays.

c) **"Calendar Day"** means every day, including Saturdays, Sundays, and federal holidays.

d) **"Bank," "we," "us," "our"** and **"TD Bank"** refer to TD Bank, N.A.

e) **"You"** and **"your"** mean each depositor who opens an Account, and any joint owner of each Account.

f) **"Store"** means a branch office.

## Part I: Personal Deposit Account Terms and Conditions

By opening and maintaining an Account with the Bank, you agree to the provisions of this Agreement, so you should read this Agreement thoroughly and keep it with other important records. From time to time, we may offer new types of Accounts and may cease offering some types of Accounts. This Agreement governs all of these new types of Accounts, and continues to govern any Accounts you may have that we no longer offer. If and to the extent the provisions of this Agreement vary from the provisions of the Uniform Commercial Code as adopted in the jurisdiction where your Account was opened, the terms and conditions of this Agreement shall control.

This Agreement includes your promise to pay the charges listed on the Personal Fee Schedule and Account Maintenance Information grid and your permission for us to deduct these charges, as earned, directly from your Account. You also agree to pay any additional reasonable charges we may impose for services you request which are not contemplated by this Agreement but are disclosed in our Personal Fee Schedule which may be amended from time to time. Each of you agrees to be jointly and severally liable for any Account deficit resulting from charges or overdrafts, whether caused by you or another authorized to withdraw from your Account, together with the costs we incur to collect the deficit, including, to the extent permitted by law, our reasonable attorneys' fees.

You agree to use the Account only for lawful purposes, and you acknowledge and agree that "restricted transactions" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued thereunder are prohibited from being processed through your Account or any relationship between

you and the Bank. In the event we identify a suspected restricted transaction, we may block or otherwise prevent or prohibit such transaction; and further, we may deny services to you, close the Account, or end the relationship. However, in the event that a charge or transaction described in this disclosure is approved and processed, you will still be liable for the charge.

### Important Information about Procedures for Opening a New Account

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When you open an Account, we will ask for your name, legal address, date of birth, Social Security or Tax Identification Number, and other information that will allow us to identify you. We may also ask to see your driver's license or any other identifying documents.

### Telephone Numbers

If you give a cell phone number directly to us, you consent to and agree to accept calls to your cell phone from us and our agents. For any telephone or cell phone calls placed to you by us or our agents, you consent and agree that those calls may be automatically dialed and/or may consist of pre-recorded messages.

### Account Ownership

The following provisions explain the rules applicable to your Account depending on the form of ownership specified on the signature card. Only the portion corresponding to the form of ownership specified will apply.

### Individual Account

An individual Account is issued to one person who does not intend (merely by opening the Account) to create any survivorship rights for any other person.

### Joint Account – With Right of Survivorship

A joint Account is issued in the name of two or more persons. If more than one of you opens an Account and signs a signature card as a co-owner of the Account, the Account is a joint Account with right of survivorship. Each of you intends that, upon your death, the balance in the Account (subject to any previous pledge to which we have consented) will belong to the survivor(s), and we may continue to honor checks or orders drawn by, or withdrawal requests from, the survivor(s) after the death of any owner(s). If two or more of you survive, you will own the balance in the Account as joint tenants with right of survivorship. The following rules apply to all joint Accounts: (i) Deposits: All deposits are the property of all of the owners of the Account. Each owner of a joint Account agrees that we may credit to the joint Account any

check or other item which is payable to the order of any one or more of you, even if the check or other item is endorsed by less than all or none of you. We may supply endorsements as allowed by law on checks or other items that you deposit to the Account. For certain checks, such as those payable by the government, we may require all payees to endorse the check for deposit. (ii) Orders: The Bank may release all or any part of the balance of the Account to honor checks, withdrawals, orders, or requests signed by any owner of the Account. Any one of you may close the Account. We may be required by service of legal process to hold or remit funds held in a joint Account to satisfy an attachment or judgment entered against, or other valid debt incurred by, any owner of the Account. None of you may instruct us to take away any of the rights of another. If there is a dispute among you, you must resolve it yourselves and the Bank does not have to recognize that dispute in the absence of any valid court order. Unless we receive written notice signed by any owner not to pay any joint deposit, we shall not be liable to any owner for continuing to honor checks or other orders drawn by, or withdrawal requests from, any owner; after receipt of any such written notice, we shall not be liable to any owner for refusing to pay any checks or honor any orders and we may require the written authorization of any or all owners for any further payments. (iii) Liability: Co-owners of a joint Account are jointly and severally liable for activity on this Account. In the event of any overdrafts on a joint Account, the joint owners agree that each owner shall be jointly and severally liable for the overdrafts in the joint Account, whether or not any particular owner: (a) created the overdraft, (b) had knowledge of the overdraft, (c) was involved in or participated in activity in the Account, or (d) derived any benefit from the overdraft.

### No Two-Signer Accounts

We do not offer accounts on which two or more signatures are required for a check or other withdrawal. Notwithstanding any provisions to the contrary on any signature card or other agreement you have with us, you agree that if any Account purports to require two or more signers on items drawn on or withdrawals from the Account, such provision is solely for your internal control purposes and is not binding on us. If more than one person is authorized to write checks or draw items on your Account, you agree that we can honor checks signed by any Authorized Signer, even if there are two or more lines on the items for your signature and two signatures are required.

### Trust Accounts

**(i) Unwritten:** If your Account is designated as a trust Account, in the absence of any written trust agreement provided to us at Account opening, this Account is deemed a Revocable Unwritten Trust, and you as trustee may withdraw all of the funds during your lifetime. In the event of your death, the

4

Account will belong to the person you named as Account beneficiary, if that person is still living. That Account beneficiary would have the sole right to withdraw the funds in the Account at anytime after your death (although the Bank may be entitled under applicable law to place a hold on the funds before payment to the beneficiary), but not before.

**(ii) Written:** If you have opened the Account as trustee of a written trust or as trustee pursuant to court order, only the trustee will be allowed to withdraw funds or otherwise transact business on the Account as designated by the trust instrument or court order. We can request a certified copy of any trust instrument or court order, but whether or not a copy is filed with us, we will not be held responsible or liable to any of the written trust's beneficiaries for the trustee's actions. Beneficiaries acquire the right to withdraw only as provided in the trust instrument or court order.

The person(s) creating either of these Trust Account types may make changes to the Account, including changes to the beneficiaries or the Account type, and may withdraw funds on deposit in the Account, only as permitted by the trust instrument or court order.

Some jurisdictions have specific laws governing other specific types of fiduciary Accounts. If you establish one of these types of Accounts, you agree to comply with all of the laws applicable to such types of Accounts.

With all fiduciary and custody Accounts, regardless of whether a written trust instrument has been provided to us, the owners and beneficiaries of the Account agree that we will not be liable if the trustee or custodian commits a breach of trust or breach of fiduciary duty, or fails to comply with the terms of a written trust agreement or comply with applicable law. We are not responsible for enforcing the terms of any written trust agreement or applicable law against the trustee or custodian, and can rely on the genuineness of any document delivered to us, and the truthfulness of any statement made to us, by a trustee or custodian.

### Uniform Gifts/Transfers To Minors Act Account

If your Account is opened under the Uniform Transfers to Minors Act or Uniform Gifts to Minors Act, the funds in the Account belong to the minor [depending on the jurisdiction in which you have opened such an Account and the circumstances, a minor may be a child under the age of eighteen (18) or under the age of twenty-one (21)] you have named. You must provide to us the minor's Social Security Number. You, as custodian, or the custodian you have named, may withdraw all of the funds in the Account at any time for the benefit of the minor you have named. Our contractual obligation to honor checks, orders, withdrawals or other requests related to the Account is with the custodian

5

only. In the event of the custodian's death, the person named as successor custodian (as provided by law) will succeed to these rights. When the minor reaches the age of majority applicable in his or her jurisdiction, or at another time determined by applicable law, the custodian shall transfer any funds remaining in the Account to the minor or to the minor's estate.

### Deposit Policy

We will usually give you provisional credit for items deposited into your Account. However, we may delay or refuse to give you provisional credit if we believe in our discretion that your item will not be paid. We will reverse any provisional credit we have given for an item deposited into your Account if we do not receive final credit for that item and charge you a fee (see Personal Fee Schedule). If the reversal of a provisional credit creates an overdraft in your Account, you will owe us the amount of the overdraft, plus any overdraft fees (see Personal Fee Schedule). We will determine when final credit is received for any item. Please read the Funds Availability Policy for a detailed discussion of how and when we make funds available to you.

We will accept certain items like foreign checks and bond coupons for collection only. You may also ask us to accept certain other items for collection only. You will not receive credit for (provisional or otherwise), and may not withdraw funds against, any of these items until we receive final credit from the person responsible for paying them. Items sent for collection will be credited to your Account in U.S. dollars, with the amount of U.S. dollars credited calculated using our applicable exchange rate that is in effect on the date when we credit the funds to your Account and not when the deposit is made. The Funds Availability Policy does not apply to items we have accepted for collection only. If and when we receive final credit for an item we have accepted for collection only, you agree that we may subtract our collection fee (see Personal Fee Schedule) from the amount finally credited to us, before we credit your Account for the remaining amount.

### Returned Checks/Waiver of Rights

If you deposit a check or item in your Account that the drawee bank returns unpaid for any reason (called "dishonor"), we may put the check or item through for collection again. This means that you are waiving your right to receive immediate notice of dishonor. If the check or item is dishonored for any reason, the amount of the dishonored check or item will be deducted from your Account. You agree to pay the Bank a fee for any such check or item that is dishonored (see Personal Fee Schedule). The Bank may also collect any amounts due to the Bank because of returned checks, through the right of set-off, from any other of your Accounts at the Bank, or collect the funds directly from you.

### Cashing of Checks

Typically, the Bank will cash checks drawn on other banks for its customers who have adequate available funds in their Account(s). If any such check should be returned by the paying bank for any reason, the Bank will charge you a fee (see Personal Fee Schedule). In addition, the Bank will debit the amount of the returned check from your Account(s). If the debit creates an overdraft in your Account, you will owe us the amount of the overdraft plus any overdraft fees (see Personal Fee Schedule).

### Withdrawal Policy

Passbook Account (if available in your jurisdiction) withdrawals can be made by an authorized signer only upon presentation of the passbook, either in person or accompanied by a written order of withdrawal. If you lose the passbook, we require that a Lost Passbook Affidavit be signed by ALL persons named on the Account before a notary public.

Statement Savings Account withdrawals can be made per written order of withdrawal in accordance with the information contained on the signature card and may also be made with an ATM or Visa® Debit Card, as applicable. The Bank may refuse a request if any document or identification required by the Bank or law in connection with the withdrawal has not been presented.

The Bank reserves the right to require seven (7) Calendar Days' written notice prior to withdrawal or transfer of funds from all Savings or Money Market Accounts offered by the Bank.

For any Statement Savings Account(s) (including Money Market Accounts), you may make as many in-person withdrawals at a teller window or any ATM as you wish. However, federal regulations permit the depositor to make no more than a combined total of six (6) pre-authorized, automatic, electronic (including computer initiated), telephone withdrawals or transfers, or payments by check, draft, debit card, or similar order payable to third parties in any monthly period (based on your statement date). We may impose a fee, as disclosed on the Personal Fee Schedule, for each such withdrawal in excess of six (6) that you make in any monthly period (based on your statement date). These fees will be reflected in your monthly statement. In addition, repeated violations will result in the Account being closed or changed from a savings type Account to a transaction Account.

For Holiday Club and Club Saver Accounts, we may impose a fee, as disclosed on the Personal Fee Schedule, for each withdrawal in excess of three (3) that you make in any calendar month. Holiday Club and Club Saver Accounts are not available for sale in the State of Maryland.

### Demand Deposit Accounts and Sub-Accounts

All Checking Accounts consist of two separate sub-accounts: a transaction sub-account, and a non-transaction sub-account. Whenever your transaction sub-account balance exceeds a certain level (which we may set and change at our discretion without notice to you), funds above that level may be transferred from the transaction sub-account to the non-transaction sub-account at the Bank's discretion, as often as once each day. All of your Checking Account transactions are posted to the transaction sub-account. Balances transferred to the non-transaction sub-account are transferred back to the transaction sub-account to meet these transactional needs, so there is no adverse impact on the availability of the balances held in your Checking Account. In accordance with federal limitations, no more than six (6) transfers from the non-transaction sub-account can occur during any statement cycle. Therefore, if a sixth transfer is needed, we will return all balances to the transaction sub-account for the remainder of the statement cycle.

These sub-accounts are treated as a single Checking Account for purposes of deposits and withdrawals, access and information, statement reporting, and any fees or charges. There are no separate or additional balance requirements, fees, or charges associated with the creation of these sub-accounts. If your Checking Account is a non-interest bearing Account, neither the transaction sub-account nor the non-transaction sub-account receives any interest. If your Checking Account is an interest-bearing Checking Account, both the transaction sub-account and the non-transaction sub-account receive the same interest rate at all times, and your periodic statement will reflect a single blended Annual Percentage Yield ("APY") and APY Earned.

In accordance with federal regulations, we reserve the right to require seven (7) Calendar Days advance notice of withdrawals from interest-bearing transaction sub-accounts and all non-transaction sub-accounts. While the Bank is required to reserve this right, the Bank does not presently exercise this right.

### Certified Taxpayer Identification Number ("TIN") or Social Security Number ("SSN")

Federal law requires you to provide to the Bank a valid and certified Taxpayer Identification Number ("TIN") or Social Security Number ("SSN"). We may be required by federal or state law to withhold a portion of the interest credited to your Account in the following circumstances:

(a)  you do not give us a correct TIN or SSN;

(b)  the IRS tells us that you gave us an incorrect TIN or SSN;

(c)  the IRS tells you that you are subject to backup withholding because you have under-reported your interest or other income;

(d)  you fail to certify to us that you are not subject to backup withholding;

(e)  you do not certify your TIN or SSN to us; or

(f)  there may be other reasons why we may be required to do so under applicable law.

If we do this, the amount we withhold will be reported to you and the IRS and applied by the IRS to the payment of any Federal income tax you may owe for that year.

### Credit Verification and Obtaining Financial Information

**You agree that we may verify credit and employment history through third parties, including but not limited to consumer reporting agencies, or verify any previous banking relationships of yours for any Accounts you have with the Bank now or in the future.** If an Account is declined based on adverse information, you may request from the consumer reporting agency a copy of the information supplied to us. Additionally, if your Account is closed for insufficient funds activity or other negative reason, a report may be made by us to one or more consumer reporting agencies or other third parties if permitted by applicable law. Please notify us if you have a dispute or if you have questions regarding the information we provide. Write to us at: TD Bank Overdraft Collections, Mailstop ME02-002-036, P.O. Box 9547, Portland, ME 04112. Please provide your name, Account number, and why you believe there is an inaccuracy or describe the item you are not sure about. We will complete any investigation and notify you of our findings and, if necessary, corrections. Please note that calling us will not preserve your rights.

If you are a licensed attorney, you agree that we may report information about overdrafts on and/or returned checks drawn on Accounts which you maintain as trustee for the benefit of another person or in any fiduciary capacity, to the extent and in the manner required by applicable laws, rules, or regulations. You agree that we have no liability to you for reporting any information to applicable authorities regarding any Account which we believe in good faith is subject to such laws, rules, or regulations.

### Periodic Statement; Limitation on Time to Report Forgeries and Errors

If your Account is not a Holiday Club, Club Saver, IRA, Passbook or CD Account, the Bank will provide you with a periodic statement. Unless you tell us of a change of address, we will continue to mail statements or any other notices to your address as it appears on our records and you will be considered to have received those statements and any other notices sent to you at that address. We do not have to send you a statement or notice if (i) you do not claim your statement, (ii) we cannot deliver your statement or

notice because of your instructions or your failure to tell us that you have changed your address, or (iii) we determine that your Account has been inactive for more than one year.

You should review your statements and balance your Account promptly after you receive them or, if we are holding them for you, promptly after we make them available to you. If you don't receive an Account statement by the date when you usually receive it, call us at once. You must review your statements to make sure that there are no errors in the Account information.

On Accounts with check-writing privileges, you must review your statement and imaged copies of paid checks, if any, we send you and report forgeries, alterations, missing signatures, amounts differing from your records, or other information that might lead you to conclude that the check was forged or that, when we paid the check, the proper amount was not paid to the proper person. You have this duty even if we do not return checks to you or we return only an image of the check. You should notify us as soon as possible if you think there is a problem.

Applicable law and this Agreement require you to discover and report any error in payment of a check within specified time periods. You agree that statements and any images of paid checks accompanying the statement shall be deemed to be "available" to you as of the statement mailing date. If we are holding your Account statements for you at your request, the statements become "available" on the day they are available for you to pick up. This means, for example, that the period in which you must report any problem with an Account begins on the day we make the statement available, even if you do not pick up the statement until later.

If you assert against us a claim that an item was not properly payable because, for example, the item was forged or an endorsement was forged, you must cooperate with us and assist us in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with the appropriate law enforcement authorities. If we ask, you also must give us a statement, under oath, about the facts and circumstances relating to your claim. If you fail or refuse to do these things, we will consider that you have ratified the defect in the item and agree that we may charge the full amount of the item to your Account.

**You must notify us as soon as possible if you believe there is an error, forgery or other problem with the information shown on your Account statement. You agree that fourteen (14) Calendar Days after we mailed a statement (or otherwise made it available to you) is a reasonable amount of time for you to review your Account statement and report any errors, forgeries or other problems. In addition, you agree not to assert a claim against us concerning any error, forgery or other problem relating to a matter shown**

10

**on an Account statement unless you notified us of the error, forgery or other problem within thirty (30) Calendar Days after we mailed you the statement (or otherwise made it available to you). This means, for example, that you cannot bring a lawsuit against us, even if we are at fault, for paying checks bearing a forgery of your signature unless you reported the forgery within thirty (30) Calendar Days after we mailed you the statement (or otherwise made it available to you) listing the check we paid.**

We may destroy original checks not less than thirty (30) Calendar Days after the statement mailing date. We will retain copies of the front and back of the checks on microfilm or other media for a period of seven (7) years. During that period, we will provide you an imaged copy of any paid check on request, but we need not do so thereafter. You agree not to make any claim against us arising out of the authorized destruction of your original checks or the clarity or legibility of any copy we provide.

### Combined Statements with Checking

If more than one checking type Account is combined together on a monthly statement, then only one Checking Account can be designated as the primary Account. This primary Account may receive imaged copies of the paid checks back with the statement, and we may impose a fee as disclosed on the Personal Fee Schedule, for providing these imaged copies. Checks for all other Accounts will be retained by the Bank. To request a copy of a paid check, please call **1-888-751-9000**.

Please note that a Health Savings Account cannot be included on a combined statement.

### Checks

All negotiable paper (called "checks") presented for payment must be in a form supplied by or previously approved by the Bank. The Bank may refuse to accept any check that does not meet this requirement or which is incompletely or defectively drawn. Once an outstanding check is six (6) months old, we may elect not to pay it. But if there is no stop payment order on file when we receive the check for payment, we may elect to pay it in good faith without consulting you. You agree that you will use care in safeguarding your unsigned checks against loss or theft. You will tell us immediately if any checks are missing. You agree to assume all losses that could have been prevented if you had safeguarded unsigned (or otherwise incomplete) checks, or had told us they were missing.

### Processing Order for Payment of Checks and Other Items

The following describes how we pay or charge to your Account checks and other items presented for payment. An "item" includes a check, substitute check, purported substitute check,

11

remotely created check or draft, electronic transaction, draft, demand draft, image replacement document, indemnified copy, ATM withdrawal or transfer, debit card point-of-sale transaction, pre-authorized debit card payment, automatic transfer, telephone-initiated transfer, ACH transaction, online banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, wire transfer, and any other instruction or order for the payment, transfer or withdrawal of funds.

For purposes of determining your Account balance and processing items to your Account, including returning items due to insufficient funds or paying items that overdraw your Account, all items are processed overnight at the end of each Business Day (which excludes Saturday, Sunday and federal holidays), as follows:

a) First, deposits that have become available to you that Business Day are added to your available Account balance. Please read the Funds Availability Policy for a detailed discussion of how and when we make funds available to you.

b) Next, the total amount of any "pending" debit card, ATM and electronic transactions that have been authorized but not yet paid is deducted from your available Account balance. When you use a debit card, ATM card, or other electronic means to make withdrawals, we may receive notice of the transaction before it is actually presented to us for payment. That notice may be in the form of a merchant authorization request or other electronic inquiry. Upon receipt of such notice, we treat the transaction as "pending" at the time we receive notice, and subject to certain exceptions, we deduct the amount of the pending transactions from your available Account balance to determine the amount available to pay other items presented against your Account. The amount of a pending authorization may not be equal to the amount of the actual transaction that is presented for payment and posted to your Account. If a pending transaction is not presented for payment within three (3) Business Days after we receive notice of the transaction, we will release the amount of the pending transaction. We do not deduct the amount of pending debit card authorizations from your available Account balance for certain merchants that frequently request authorization for amounts in excess of the likely transaction amount, including hotels and resorts, airlines and cruise lines, car rental companies, and automated gas pumps (pay at the pump).

c) We then post items to your Account by category, in the following order:

   i) Outgoing wire transfers, return deposit items, and debit adjustments to your Account balance;

   ii) Overdraft fees, other returned item fees, and deposit return fees;

iii) All other Account fees (except as described in (iv) below), and all other items including checks, ATM transactions, and debit card transactions; and

iv) Fees assessed at the end of the statement cycle including, for example but not limited to, monthly maintenance fees.

Within categories i, ii, and iii, we post items in order from largest to smallest.

We do not process transactions in the order in which they occur. The order in which items are processed may affect the total amount of overdraft fees incurred. Overdraft fees may be assessed on items presented for payment that bring your Account into a negative balance, as well as any subsequent transactions presented for payment while the Account has a negative balance. See "Overdrafts" and "Sustained Fee for Overdrawn Accounts" below, as well as the Personal Fee Schedule for more information. Overdraft fees are not charged on "pending" authorizations, although they reduce your available balance.

We may from time to time change the order in which we accept, pay or charge items to your Account even if (a) paying a particular item results in an insufficient balance in your Account to pay one or more other items that otherwise could have been paid out of your Account; or (b) using a particular order results in the payment of fewer items or the imposition of additional fees. If we do change our processing order for checks and other items presented for payment from your Account, we will provide advance notice of the change.

### We may refuse to pay a check or other item which:

a) is illegible;

b) is drawn in an amount greater than the amount of funds then available for withdrawal in your Account (see the Funds Availability Policy) or which would, if paid, create an overdraft;

c) bears a duplicate check number;

d) we believe has been altered;

e) we believe is otherwise not properly payable; or

f) we believe does not bear an authorized signature.

We are not required to honor any restrictive legend on checks you write unless we have agreed in writing to the restriction. Examples of restrictive legends are "Not Valid For More Than $1000," "Void If Not Negotiated Within 30 Days of Issuance," and the like.

### Postdated Items

You agree that when you write a check you will not date the check in the future. If you do and the check is presented for payment before the date of the check, we may either pay it or return it unpaid. You agree that if we pay the check, the check will be posted to your Account on the day we pay the check. You further agree that we are not responsible for any loss to you in doing so.

13

### Pre-authorized Drafts

If you voluntarily give information about your Account (such as our routing number and your Account number) to a party who is seeking to sell you goods or services, and you do not physically deliver a check to the party, any debit to your Account initiated by the party to whom you gave the information is deemed authorized by you.

### Overdrafts

An overdraft is an advance of funds greater than the amount that has become available in accordance with the Bank's Funds Availability Policy, made by us to you, at our sole discretion. Overdrafts may include advances to cover a check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account. We may demand immediate repayment of any overdraft and charge you an overdraft fee (see Personal Fee Schedule).

You may overdraw your account by up to $5 per day without being charged a fee. If your negative available balance exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account (see "Important Information for Consumers about your TD Bank Checking Account" brochure).

You agree to pay us, when we ask you, all of our costs of collecting an overdraft, to the fullest extent permitted by applicable law. These costs include, but are not limited to, our legal fees and expenses. If more than one of you owns an Account, each of you will be responsible for paying us the entire amount of all overdrafts and obligations resulting from the overdrafts.

We do not have to allow you to make an overdraft. Intentionally withdrawing funds from an Account when there are not enough funds in the Account to cover the withdrawal or when the funds are not yet available for withdrawal may be a crime.

### Sustained Fee for Overdrawn Accounts

We may charge you a fee, as disclosed in the Personal Fee Schedule, for any Checking or Money Market Account that remains in overdrawn status for ten (10) consecutive Business Days. We will notify you if your Checking or Money Market Account is in overdrawn status. If your Checking or Money Market Account is in overdrawn status because of an overdraft, check returned for insufficient funds or for any other reason and the Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee. If you have overdraft protection and you have exceeded your limit and the Checking or Money Market Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.

If the Checking or Money Market Account remains in overdrawn status for sixty (60) Calendar Days, or such earlier time that we determine that the overdraft balance is uncollectible, the Bank

14

will close and place the Checking or Money Market Account in collection status.

## Stop Payments

At your request and risk, the Bank will accept a stop payment request for a check on your Account for a fee (see Personal Fee Schedule). To be effective, a stop payment request must be received in such timely manner so as to give the Bank a reasonable opportunity to act on it, and must precisely identify the Account number, check number, date and amount of the item, and the payee.

Your stop payment request will be effective after the request has been received by the Bank and the Bank has had a reasonable opportunity to act on it. Regardless of whether your stop payment request has been made orally or in writing, it will remain in effect for one (1) year from the date it was given. If your stop payment request has been made orally, the Bank will send you a written confirmation. If your stop payment request is made in writing, you must use a form that is supplied by the Bank; this form will constitute written confirmation of your request. In either case, it is your responsibility to ensure that all of the information supplied on your written confirmation is correct and to promptly inform the Bank of any inaccuracies.

To maintain the validity of the stop payment request for more than one (1) year, you must furnish a new stop payment request that is confirmed in writing as described in the preceding paragraph before the expiration of the one (1) year period. If a new stop payment request is not received, the check may be paid.

We are not liable for failing to stop payment if you have not given us sufficient information or if your stop payment request comes too late for us to act on it. We are entitled to a reasonable period of time after we receive your stop payment request to notify our employees and take other action needed to stop payment. You agree that "reasonable time" depends on the circumstances but that we will have acted within a reasonable time if we make your stop payment request effective by the end of the next Business Day following the Business Day on which we receive your stop payment request. If we stop payment, you agree to defend and pay any claims raised against us as a result of our refusal to pay the check or other item on which you stopped payment.

If we recredit your Account after we have paid a check or other item over a valid and timely stop order, you agree to sign a statement describing the dispute you have with the person to whom the check or item was made payable. You also agree to transfer to us all of your rights against the payee and any other holder, endorser or prior transferee of the check or item and to cooperate with us in any legal action taken to collect against the other person(s).

If we are liable for inadvertently paying your check over a stop payment order, you must establish the amount of your loss caused by our payment of the check. We will pay you only the amount of the loss, up to the face amount of the check. You agree that we shall not be liable for any punitive, exemplary or consequential damages.

The Bank has no duty to stop payment on a cashier's check, teller's check or other similar item because items of this type are not drawn on your Account. The Bank may, in its sole discretion, attempt to stop payment on a cashier's check, teller's check or other similar item if you certify to our satisfaction that the item has been lost, stolen or destroyed. You must also furnish any other documents or information we may require, which may include your affidavit attesting to the facts and your indemnification of the Bank. Even if the Bank agrees to attempt to stop payment on a cashier's check, teller's check or other similar item, if the item is presented for payment, the Bank may pay it and you will be liable to us for that item, unless otherwise required by applicable law.

### International ACH and Wire Transactions

If your Account receives incoming ACH transactions (either credits or debits) or wire transfers initiated from outside of the United States, both you and we are subject to the Operating Rules and Guidelines of the National Automated Clearing House Association ("NACHA") or the rules of any wire transfer system involved, and the laws enforced by the Office of Foreign Assets Control ("OFAC"). Under such rules and laws, we may temporarily suspend processing of a transaction for greater scrutiny or verification against the OFAC list of blocked parties, which may result in delayed settlement, posting and/or availability of funds. If we determine there is a violation, or if we cannot satisfactorily resolve a suspected or potential violation, the subject funds will be blocked as required by law. If you believe you have adequate grounds to seek the return of any blocked funds, it is your sole responsibility to pursue the matter with the appropriate governmental authorities. Please see the OFAC website for procedures and form required to seek a release of blocked funds.

We may impose a fee, as disclosed on the Personal Fee Schedule, for any domestic or international incoming wire transactions.

### Incoming Wire Payment Instructions

Please provide the sender of a wire the following information in order for you to receive the funds in a timely manner:

1. For Incoming USD International wires from foreign countries, the wiring instructions are as follows:

Wire to:      TD Bank N.A.
              Wilmington, Delaware

FED ABA#:     0311-0126-6

Credit to:     TD Bank Customer Name (Full Name)
                 Customer's full physical address
                 (street, city, state, country)
                 Customer's full Account Number

2.  For Incoming Foreign Currency international payment, the wiring instructions are as follows:

Wire to:     The Toronto-Dominion Bank

Swift code:     TDOMCATTTOR
                 The Toronto-Dominion Bank, Toronto, Ontario, Canada , M5K 1A2

For Further Credit to Beneficiary Bank, TD Bank N.A.:

Swift code:     NRTHUS33XXX
                 TD BANK, N.A.
                 TD BANK, N.A. Branch Full Address
                 (street, city, state, country)

In Favor of:
Beneficiary Full Account Number:
                 The Customer's full account number

Beneficiary Full Name:
                 The Customer's full name on the account

Beneficiary Address:
                 The Customer's full physical address
                 (street, city, state, country)

## Changing Your Account

If we agree to let you make any change to your Account type in the middle of the Account's statement period, without requiring you to open a new Account and without changing your Account number, you agree that the following rules will apply to the statement period in which we agree to let you make this change:

1.  **Interest:** The rules for the payment of interest (if any) on the new Account will take effect on the day the type of Account is changed (the "Change Date"). For the days before the Change Date, the rules for the payment of interest (if any) and for any minimum balance that must be maintained in order to qualify for interest (if any) that applied to the old Account will apply.

2.  **Fees and Charges:** The rules for all fees and charges that we may charge in connection with the new Account, and for any minimum balance that must be maintained in order to avoid certain fees and charges, will take effect after the Change Date.

3.  **Account Statement:** The Account statement you will receive for the statement period that includes the Change Date will show: (1) the total interest earned or accrued during the entire statement period; (2) the corresponding "annual percentage

17

yield earned" for the entire statement period; and (3) the fees and charges subtracted from your Account during the entire statement period.

## Power of Attorney

We may, in our sole discretion (unless we are required by law to recognize a statutory form of power of attorney), recognize the authority of a person to whom you have given a power of attorney to enter into transactions relating to your Account, until and unless we receive written notice or we have actual notice of the revocation of such power of attorney. However, you must show us an original copy or certified copy of the power of attorney, properly notarized, and any other documentation we may ask for from time to time. The power of attorney and all other documents must be in a form satisfactory to the Bank. We will not be liable for damages or penalty by reason of any payment made to, or at the direction of, a person holding a power of attorney.

## Adverse Claims; Interpleader; Legal Process

We need not honor any claim against or involving an Account unless we are required to do so by order of a court or government agency that has jurisdiction over us, or pursuant to applicable law. This rule applies to any person asserting any rights or interest regarding an Account, including you and other persons who are authorized to make withdrawals or write checks or who present a power of attorney signed by you.

If we receive notice of any claim or dispute or of any legal proceeding we reasonably believe involves you or any of your Accounts, in our discretion we may suspend transactions on any Account which we believe to be affected until final determination of the claim or proceeding. We may place a hold on any funds in the Account and suspend transactions whether the affected Account is in your name alone or is a joint Account. An Account may be suspended even though the suspension may have been due to inadvertence, error because of similarity of the names of depositors, or other mistake.

You agree that we may comply with any state or federal legal process, including, without limitation, any writ of attachment, adverse claim, execution, garnishment, tax levy, restraining order, subpoena or warrant relating to you or your Account which we believe to be valid, without any liability from us to you. You agree that if we are served with legal process at any of our Stores or offices, we may comply with it, even if it is served at a location other than where your Account was opened. Further, you agree that we may comply with such process as we deem appropriate under the circumstances even if the legal process or document appears to affect the interest of only one owner of a joint Account. In such case, we may refuse to permit withdrawals or transfers from your Account until such legal process is satisfied or dismissed even if such action results in insufficient funds to

pay a check you have written or otherwise satisfy an obligation you may have incurred.

You agree that we are entitled to a processing fee, for which you are liable to us, upon receipt of any legal process. We may deduct such fee, as well as any expenses, including without limitation attorneys' fees, in connection with any such document or legal process, from your Account or any other Account you may have with us without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment, attachment or other levy against your Account shall be subject to our right of set-off and security interest.

You agree that we will not pay and you shall not be entitled to receive interest on any funds we hold or set aside in connection with or in response to legal process. Finally, you agree that we may accept and comply with legal process, irrespective of how and/or where it was received even if the law requires any particular method of service.

You agree to indemnify us against all losses, costs, attorneys' fees, and any other liabilities that we incur by reason of responding to or initiating any legal action, including any interpleader action we commence involving you or your Account. As part of that indemnity, in the event we incur liability to a creditor of yours as a result of our response or failure to respond to a legal action, you agree to pay us on demand the amount of our liability to your creditor and to reimburse us for any expense, attorneys' fees, or other costs we may incur in collecting the amount from you.

We may, in our sole discretion and without any liability to you, initiate an action in interpleader to determine the rights of the persons making adverse claims to your Account. We may exercise the right regardless of whether the persons making the adverse claims have complied with all statutory requirements pertaining to adverse claims, such as posting a bond or giving other surety. Upon initiation of an interpleader action, we will be relieved and discharged of all further duties and obligations.

### If You Owe Us Money

If you withdraw funds from your Account that you do not have a right to withdraw, including the amount of a check or other item which we later charge back to your Account or any amounts that may be credited to your Account in error, you will have to pay us back. If you do not, we can bring a lawsuit against you to get the money back. We can also do this if you owe us any fees or charges in connection with your Account and you do not pay us. If we bring a lawsuit against you, you agree to pay our court costs and reasonable attorneys' fees as awarded by the court and as permitted by law.

### Right of Set-Off

Unless we are prohibited by applicable law, the Bank can take any funds in any of your Account(s) to pay any debt you owe us that is in default. This is called the right of set-off and applies to all funds of yours in our possession now or in the future. We can use this right of set-off without giving you any notice (unless notice is required by applicable law) and without going through any legal processes or court proceedings. If this is a joint Account, the right of set-off applies to deposits of each co-owner to pay the debts owed to us by any or all of you. Likewise, we could withdraw money from an Account owned by only one person and apply it to reduce the joint debt of that person and another person. This right of set-off does not apply to your Account if: (a) it is an IRA or a tax-deferred retirement Account, Health Savings Account, or Coverdell Education Savings Account; or (b) the debt is created by a consumer credit transaction under a credit card plan; or (c) the debtor's right of withdrawal arises only in a representative capacity.

We also have a right to place a hold on funds in your Account(s) if we have a claim against you or pending exercise of our right of set-off. If we place a hold on your Account, you may not withdraw funds from the Account and we can refuse to pay checks or other items drawn on the Account.

In addition to any right of set-off, you hereby grant to the Bank a security interest in your deposit Accounts to secure all loans or other extensions of credit, now or in the future.

### Death/Incompetence

Your death, or a declaration that you are legally incompetent to handle your affairs, does not end our authority to pay checks signed or other items authorized by you, to accept deposits or to collect items deposited until we receive written notice of your death or declared incompetence. Even after we receive notice, we can pay checks or other items authorized by you before your death or declared incompetence for such period of time permitted under applicable law.

On joint Accounts, your death or declared incompetence does not affect the rights of any other owner of the Account to make deposits, make withdrawals or, if applicable, write checks. We may require the surviving owners and any in-trust-for Account beneficiary to provide reasonable proof of your death or incompetence and, in some jurisdictions, provide any tax releases or other documents or consents needed from government authorities before we pay any checks or other items authorized on your joint Account or allow the surviving owners or your beneficiary to withdraw any funds from the Account. Each of you is responsible for notifying us when any other joint owner of an Account dies.

Certain checks or other items made payable to a deceased joint Account holder (e.g. Social Security checks or electronic deposits) must be returned to the issuer and may not be used, cashed or disposed of in any other way by the surviving Account holders. If such items are used, cashed or disposed of by any one or all of the surviving Account holders, each Account holder remains liable for the amount of the item and any charges incurred as a result of the improper use of the item. In our discretion, we can charge your Account for the amount of these items and remit payment to the issuer of the item.

## Limited Liability

UNLESS EXPRESSLY PROHIBITED OR OTHERWISE RESTRICTED BY APPLICABLE LAW, THIS AGREEMENT, OR THE ELECTRONIC FUNDS TRANSFERS DISCLOSURE, THE BANK'S LIABILITY IS LIMITED AS FOLLOWS: THE BANK WILL NOT BE LIABLE TO YOU FOR PERFORMING OR FAILING TO PERFORM OUR SERVICES UNDER OR IN CONNECTION WITH THIS AGREEMENT UNLESS WE HAVE ACTED IN BAD FAITH. WITHOUT LIMITING THE ABOVE, THE BANK WILL NOT BE LIABLE FOR DELAYS OR MISTAKES WHICH HAPPEN BECAUSE OF REASONS BEYOND OUR CONTROL, INCLUDING, BUT NOT LIMITED TO, ACTS OF BANKING AUTHORITIES, NATIONAL EMERGENCIES, ACTS OF GOD, FAILURE OF TRANSPORTATION, COMMUNICATION OR POWER SUPPLY, MALFUNCTION OF OR UNAVOIDABLE DIFFICULTIES WITH THE BANK'S EQUIPMENT. SHOULD A COURT ESTABLISH THE BANK'S LIABILITY TO YOU PURSUANT TO WHAT WAS DONE OR NOT DONE UNDER THIS AGREEMENT, YOU MAY RECOVER FROM THE BANK ONLY YOUR ACTUAL DAMAGES, IN AN AMOUNT NOT TO EXCEED THE TOTAL FEES AND CHARGES PAID BY YOU TO THE BANK PURSUANT TO THIS AGREEMENT DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE LIABILITY. IN NO EVENT WILL YOU BE ABLE TO RECOVER FROM THE BANK INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES OR LOST PROFITS, WHETHER OR NOT IT HAS NOTICE THEREOF.

This Agreement and the deposit relationship do not create a fiduciary, quasi-fiduciary, or special relationship between you and us. Our deposit relationship with you is that of debtor and creditor. The Bank's internal policies and procedures are solely for our own purposes and do not impose on us a higher standard of care than otherwise would apply by law without such policies or procedures.

## Default

Your Account may be in default if: (a) you have repeatedly overdrawn your Account; (b) you do not repay immediately any overdraft; (c) you do not comply fully with any term or condition of this Agreement or of any other agreement you may have with us; (d) you give us false or misleading information about yourself

or any of your deposit or credit relationships with us or with others; (e) you file or someone else files against you a petition in bankruptcy; (f) any of your loans with us is past due or otherwise in default; (g) we, in our sole discretion, are not satisfied with your condition or affairs, financial or otherwise; or (h) we, in our sole discretion, believe that your financial condition has suffered an adverse change.

If you are in default, we may close any or all of your Accounts, with or without notice (unless notice is required under applicable law), or we may exercise all available rights and remedies provided elsewhere in this Agreement or other agreements and all rights and remedies available at law or equity.

## Indemnity

a) **In General.** You agree to indemnify, and hold TD Bank harmless from and against any and all losses, liabilities, penalties, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) or other harm or injury that we may incur as a result of any claim asserted against us by any third party arising out of any action at any time taken or omitted to be taken by (i) you under or in connection with this Agreement, including, but not limited to, your failure to observe and perform properly each and every obligation in accordance with this Agreement and any other agreement which you enter into with us; or (ii) us in reliance upon any certification, evidence of authority, or other document or notice given or purporting to have been given by you to us, or any information or order which you provide to us. This indemnification does not apply to claims that you may assert against us, or to any amounts we are obligated to pay you under the terms of this Agreement or applicable law.

b) **Your Instructions to Us.** Without limiting the above, if you give us instructions which we believe may expose us to potential liability, we may refuse to follow your instructions. If we decide to follow your instructions, you agree to indemnify us against all losses, costs, attorneys' fees and any other liabilities we incur. In addition, we may ask you for certain protections, such as a surety bond or your indemnity in a form satisfactory to us.

## Jury Trial Waiver

YOU AND WE EACH AGREE THAT NEITHER YOU NOR WE SHALL (A) SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER ACTION BASED UPON, OR ARISING OUT OF, THIS AGREEMENT OR ANY ACCOUNT OR THE DEALINGS OF THE RELATIONSHIP BETWEEN YOU OR US, OR (B) SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION SHALL BE SUBJECT TO NO EXCEPTIONS. NEITHER YOU NOR WE HAVE AGREED WITH OR REPRESENTED

<mark>TO THE OTHER THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES. YOU AND WE EACH ACKNOWLEDGE THAT THIS WAIVER HAS BEEN KNOWINGLY AND VOLUNTARILY MADE.</mark>

## Miscellaneous

a) **Our Right to Refuse/Close Accounts:** The Bank reserves the right to refuse to open any Account and to terminate any Account at any time, and for any reason, or no reason without notice to you (unless notice is required under applicable law). This Agreement survives the closing of your Account.

b) **Our Right to Delay Enforcement:** We can choose to not enforce or delay in enforcing any provisions of this Agreement without losing the right to enforce them in the future.

c) **Assignment:** Your Account may not be transferred, pledged or assigned without the Bank's prior written consent, to be given or refused at the Bank's sole discretion.

d) **Items in the Mail:** We are not responsible for any items you mail to us that are lost in transit. Therefore, you may not wish to place currency or coupons in the mail.

e) **Direct Deposit:** If you have direct deposit, you agree that if a direct deposit must be returned for any reason, you authorize us to deduct the amount from this Account or any other Account you may have with us, without prior notice and at any time.

f) **Accounts with Zero Balance:** We may consider any Account (excluding CDs) having a zero balance for forty-five (45) Calendar Days to be closed by you.

g) **Notice of Address Changes:** You must notify us in writing, by phone or at any of our banking offices, of any change of address. Any communication we send to you at the last address as shown on our records will be binding on you for all purposes. You agree we may change your address on our records based on information provided by the United States Postal Service without notice to you.

h) **Abandoned Accounts:** If your Account is considered to be abandoned under applicable law because you have not used or acknowledged your Account for a time period directed by law, we must turn over the funds in your Account to the appropriate governmental authority. We may give notices as required by law before we do this. You may try to reclaim funds turned over to the governmental authority to the extent permitted by applicable law.

i) **Account Mailings:** From time to time, the Bank may enclose advertising or promotional materials with any periodic statement that is mailed or otherwise made available to you with respect to your Account(s). These materials may include, without limitation, information regarding new, modified or discontinued products or services, as well as sweepstakes

or other contests sponsored by the Bank. By opening and maintaining an Account with the Bank, you consent to the mailing and receipt of these advertising or promotional materials with your periodic statement.

j)   **Banking Practices:** In the absence of a specific provision in this Agreement to the contrary, your Account will be subject to our usual banking practices and, to the extent not inconsistent therewith, the general commercial banking practices in the area we serve.

k)   **Severability:** If any provision of this Agreement is invalid, changed by applicable law or declared invalid by order of a court, the remaining terms of this Agreement will not be affected, and the invalid provision shall be reformed in order to preserve the original intent of this Agreement to the fullest extent feasible. However, if such reformation is not feasible, this Agreement will be interpreted as if the invalid provision had not been placed in this Agreement.

l)   **Governing Law:** This Agreement is governed by the laws of the jurisdiction in which the Store where you opened your Account is located, except where applicable federal law is controlling.

m)   **Amendments:** We reserve the right to change the terms of this Agreement or change the terms of your Account at any time. We will give you such notice of the change as we determine is appropriate, such as by statement message or enclosure, letter, or as posted in the Store, and as required under applicable law. Where applicable law permits, we can notify you of the changes by posting a new version of this Agreement online, or by making the new version available in our Stores. Your continued use of the Account following the effective date of any such change indicates your consent to be bound by this Agreement, as amended. If you would like a copy of a current Agreement or have questions, please ask any Bank representative or call us at **1-888-751-9000.**

n)   **Maine Disclosure of Complaint Resolution Procedures:** If you have a dispute with TD Bank regarding your deposit account, you may contact us and attempt to resolve the problem directly. If we fail to resolve the problem, you may communicate the problem and the resolution you are seeking to:

Bureau of Financial Institutions
36 State House Station
Augusta, Maine 04333-0036

To file a complaint electronically, you may contact the Bureau of Financial Institutions at the following Internet address: www.maine.gov/pfr/financialinstitutions/complaint.htm.

The Bureau of Financial Institutions will acknowledge receipt of your complaint promptly and investigate your claim. You

24

will be informed of the results of the investigation. When your complaint involves a federally-chartered financial institution or credit union, the Bureau of Financial Institutions will refer it to the appropriate federal supervisory agency and inform you to whom it has been referred.

## Part II: Truth in Savings Disclosure

1. **Accounts Covered:** "Accounts" covered by this disclosure include ALL personal deposit Accounts including Checking, interest bearing Checking, Money Market Accounts, Passbook Savings (where applicable), Statement Savings, and Certificates of Deposit (called "CDs"). Your Account will be considered open when you sign a signature card and we receive credit for your initial deposit. You must also complete and sign any other Account documentation that we may require from time to time to maintain your Account. Where applicable, information also pertains to like Private Banking Accounts.

2. **Interest Rate and ANNUAL PERCENTAGE YIELD:** The current interest rate on your Account and the Annual Percentage Yield (or "APY") are as shown on the accompanying Rate Sheet, which is considered part of this disclosure.

Note: If this disclosure was given to you in connection with an inquiry, the Interest Rate(s) and APY(s) shown are rates that the Bank has offered within the seven (7) most recent Calendar Days, and are accurate as of the date shown on our Retail Rate Sheet. Current rates may be obtained by calling Customer Service at the toll-free number listed on the back of this disclosure.

TD Convenience Checking, TD Student Checking, TD Simple Checking and Savings Transaction Accounts: These are non-interest bearing Accounts and have no APY.

All interest bearing Checking, Savings, and Money Market Accounts: The interest rate and APY may change daily and are adjusted periodically by the Bank based on various economic factors. There is no limit on changes up or down and the rates are subject to change at any time without notice.

**To Obtain the Annual Percentage Yield ("APY") Disclosed:** You must maintain the minimum tier balance in the Account each day in order to obtain the disclosed APY for that particular tier. The APY disclosed assumes the Account remains on deposit for one year at the same interest rate.

**TD Relationship Savings:** For personal and certain personal Trust TD Relationship Savings accounts, the interest rate and APY applied will also be determined by whether or not TD Bank has on record an eligible TD Bank account linked to that TD Relationship Savings account. An eligible account is a personal TD Bank Checking, Mortgage, Home Equity, or Credit Card account.

25

Definition of personal and certain personal Trust TD Relationship Savings accounts:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| TD Relationship Savings<sup>SM</sup> | In good standing | Individual, Primary or Secondary Owner, OR Trust set up with a Social Security Number, or be a Trustee of such a Trust account |

Eligible accounts you may link:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| Mortgage*, Home Equity Line of Credit, Home Equity Loan | In good standing | Individual, Primary or Secondary Owner |
| Credit Card | In good standing | Individual or Primary Owner |
| Checking | In good standing and, one Deposit, Withdrawal, Payment or Transfer transaction during the previous calendar month | Individual, Primary or Secondary Owner |

*Mortgages that we no longer service are not eligible

In addition, certain personal Trust accounts are eligible to be linked:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| Checking | In good standing and, one Deposit, Withdrawal, Payment or Transfer transaction during the previous calendar month | Trust set up with a Social Security Number, or be a Trustee of such a Trust account |

On the last Business Day of a calendar month, if you do not have a linked, eligible personal Account (Checking, Mortgage, Home Equity Loan, Home Equity Line of Credit or Credit Card Account), the interest rate and APY applied to your account from the first Business Day of the next calendar month will be adjusted to reflect this change.

For the current interest rate on your account, please refer to the appropriate table on the accompanying Rate Sheet.

26

| Type of TD Relationship Savings account | Table on Rate Sheet |
|---|---|
| Qualifying TD Relationship Savings accounts with an eligible TD Bank account linked to it | TD Relationship Savings (with linked account) |
| All other TD Relationship Savings accounts | TD Relationship Savings (without linked account) |

Non-personal TD Relationship Savings accounts will receive the interest rate and APY applicable to TD Relationship Savings accounts without a linked account.

Information regarding your linked account may be made available to any other owner or signer on any of the accounts you have linked.

If you choose to link your personal account to an account for which you serve as trustee, either of your accounts may receive a financial benefit, which could be a violation of your fiduciary duties.

**TD Growth Money Market:** For personal and certain personal Trust TD Growth Money Market accounts, the interest rate and APY applied will also be determined by whether your account meets all of the following criteria:

a. Whether or not your TD Growth Money Market account qualifies, as defined below:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| TD Growth Money Market<sup>SM</sup> | In good standing | Individual, Primary or Secondary Owner, OR Trust set up with a Social Security Number, or be a Trustee of such a Trust account |

b. Whether or not we have on record an eligible, personal TD Bank Checking account linked to your TD Growth Money Market account. Eligible accounts you may link include:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| Personal Checking | In good standing | Individual, Primary or Secondary Owner |
| Personal Checking (Trust) | In good standing | Trust set up with a Social Security Number, or be a Trustee of such a Trust account |

c. Whether or not your TD Growth Money Market has grown by $50 or more during your current statement cycle. This is determined by comparing the closing balance on your current statement to the closing balance on your previous statement.

27

d.  Whether or not you made at least one qualifying transfer into your TD Growth Money Market account during your current statement cycle.

   i.  A qualifying transfer is a recurring transfer of any amount from a TD Bank account.  Eligible transfers include recurring transfers set up by phone or at a TD Bank Store, or through Online Banking. Transfers set up using ATMs, voice response units, overdraft protection transfers, and sweeps are not eligible.

   ii.  In addition, an Immediate transfer completed through Online Banking will also qualify.

   iii.  To be eligible, your qualifying transfer must post during the period starting the first business day and ending the last business day of your current statement cycle. Please be aware of the available balance in your accounts - transferring funds from an account with an insufficient balance may result in an Overdraft and a fee may be charged.  Please refer to the Overdraft section for details.

On the last business day of your statement cycle, we will determine whether you meet the above requirements, and the interest rate and APY applied to your account from the first business day of the next statement cycle will be adjusted, if necessary, to reflect your account qualification status.

For the current interest rate on your account, please refer to the appropriate table on the accompanying rate sheet.

| Type of TD Growth Money Market | Table on Rate Sheet |
| --- | --- |
| Qualifying TD Growth Money Market accounts with a linked eligible Checking account, net balance growth of at least $50, and a recurring transfer into the account | TD Growth Money Market (with Qualifying Activity) |
| All other TD Growth Money Market accounts | TD Growth Money Market (without Qualifying Activity) |

Non-personal TD Growth Money Market accounts will receive the interest rate and APY applicable to TD Growth Money Market accounts without qualifying activity.

Information regarding your linked account may be made available to any other owner or signer on any of the accounts you have linked.

If you choose to link your personal account to an account for which you serve as trustee, either of your accounts may receive a financial benefit, which could be a violation of your fiduciary duties.

<u>Fixed Rate CDs:</u> The interest rate and APY are fixed for the term of the certificate and may only be changed at maturity.

28

Step Rate CD: Three (3) and five (5) year terms are available. The APY will increase every year on the anniversary of the Account open date. At maturity, the Step Rate CD will renew to a one (1) year term.

2A. **TD Relationship Checking, TD Relationship Savings and Private High Yield Savings Accounts:** The Chart which follows indicates the balance tier levels used to determine the variable interest rate and APY being applied to your Account. The interest rate and annual percentage yield for the appropriate tier will be paid on the full balance in the Account.

**Balance Tier Structure:**

| | |
|---|---|
| $        0.01 – $   999.99 | $   50,000.00 – $  99,999.99 |
| $  1,000.00 – $  9,999.99 | $  100,000.00 – $249,999.99 |
| $10,000.00 – $24,999.99 | $  250,000.00 – $499,999.99 |
| $25,000.00 – $49,999.99 | $  500,000.00 – $999,999.99 |
| | $1,000,000.00+ |

2B. **TD Growth Money Market**: The Chart below indicates the balance tier levels used to determine the variable interest rate and APY being applied to your Account. The interest rate and annual percentage yield for the appropriate tier will be paid on the full balance in the Account.

**Balance Tier Structure:**

| | |
|---|---|
| $        0.01 – $   999.99 | $  10,000.00 – $  24,999.99 |
| $1,000.00 – $1,999.99 | $  25,000.00 – $  49,999.99 |
| $2,000.00 – $4,999.99 | $  50,000.00 – $  99,999.99 |
| $5,000.00 – $9,999.99 | $100,000.00 – $249,999.99 |
| | $250,000.00+ |

2C. **TD Premier Checking:** The Chart below indicates the balance tier levels used to determine the variable interest rate and APY being applied to your Account. The interest rate and annual percentage yield for the appropriate tier will be paid on the full balance in the Account.

**Balance Tier Structure:**

| | |
|---|---|
| $        0.01 – $ 2,499.99 | $  50,000.00 – $249,999.99 |
| $2,500.00 – $49,999.99 | $250,000.00+ |

2D. **Private Tiered Checking Account:** The Chart below indicates the balance tier levels used to determine the variable interest rate and APY being applied to your Account. The interest rate and annual percentage yield for the appropriate tier will be paid on the full balance in the Account.

**Balance Tier Structure:**

| | |
|---|---|
| $        0.01 – $ 9,999.99 | $  25,000.00 – $249,999.99 |
| $10,000.00 – $24,999.99 | $250,000.00 – $499,999.99 |
| | $500,000.00+ |

2E. **Health Savings Account:** The Chart on page 31 indicates the balance tier levels used to determine the variable interest rate and APY being applied to your Account. The interest rate and annual percentage yield for the appropriate tier will be paid on the full balance in the Account.

29

**Balance Tier Structure:**

| | |
|---|---|
| $     0.01 – $2,499.99 | $10,000.00 – $24,999.99 |
| $2,500.00 – $9,999.99 | $25,000.00 – $49,999.99 |
| | $50,000.00+ |

**2F. NOTICE: Applicable to Certificates of Deposit ONLY:**

(i) **Early Withdrawal Penalties:** No part of the principal may be withdrawn prior to maturity without the Bank's consent. No withdrawals will be permitted during the first seven (7) days of the CD term. If the Bank does allow an early withdrawal, the following penalties will apply:

| CD Term<br>(including Basic, No Catch and<br>IRA Add-Vantage CDs) | Penalty |
|---|---|
| 7 – 89 days | All interest |
| 90 days < 1 year | 3 months' interest |
| 1 year < 2 years | 6 months' interest |
| 2 years + | 9 months' interest |
| **Step Rate CD Term** | **Penalty** |
| 3 years | 9 months interest |
| 5 years | 12 months interest |

In certain circumstances, such as the death or incompetence of an owner of the CD, the penalty may be waived. In no circumstances can the amount withdrawn bring the balance to below the Minimum to Open, as disclosed in the accompanying Account Maintenance Information grid.

Step Rate CD: Partial and full withdrawals may be made without penalty during a ten (10) day grace period that begins on each anniversary of the account opening date.

"No Catch" CD: At no cost to you, you will have the option to withdraw principal funds without penalty once during the term of the CD. Therefore, if you choose to withdraw principal funds, there will be no penalty for that withdrawal. More than one withdrawal of principal during the term of this CD may result in a penalty. The interest rate and APY remain the same for the term. No withdrawals will be permitted during the first seven (7) days of the CD term.

(ii) **Withdrawal of Interest Prior To Maturity:** The APY disclosed assumes interest and principal will remain on deposit until maturity. A withdrawal will reduce earnings. For CDs of less than one (1) year, the APY assumes the CD remains on deposit for one (1) year at the current rate.

(iii) **Renewal Policies:** Unless otherwise noted, CDs will automatically renew to the same term at maturity. At maturity, the Step Rate CD will renew to a one (1) year CD.

At maturity you will have ten (10) Calendar Days after the maturity date to withdraw the funds without penalty. Interest not withdrawn will be converted to principal upon the renewal of the certificate.

(iv) **Interest Computation:** Interest is accrued on all deposits as of the day the Account is opened on a 365/365-day basis (366/366-day basis during a leap year), and is compounded monthly on the cycle date. The APY for the Account assumes that interest will remain on deposit until maturity; a withdrawal will reduce earnings. The daily balance method is used to calculate the interest on the Account. This method applies a daily periodic rate to the principal in the Account each day. Interest is credited monthly for all CDs.

3. **Frequency of Compounding and Crediting of Interest (Applicable to All Interest Bearing Accounts):** With the exception of Holiday Club and Club Saver Accounts, the Bank compounds interest monthly. Interest is credited on a monthly basis. For Holiday Club and Club Saver Accounts, the Bank compounds interest daily and credits the interest at maturity. If you or we close your interest bearing Account before the date of interest posting, accrued interest in the amount of $10 or more will be paid. Accrued interest in an amount under $10 will not be paid except at the discretion of the Bank.

4. **Minimum Balance Requirements (All Accounts):**

(i) **To Open Accounts:** To open an Account, you must deposit the amount shown in the accompanying Account Maintenance Information grid.

(ii) **To Avoid Imposition of Monthly Maintenance Fees:** To avoid the imposition of monthly maintenance fees, you must maintain the minimum required daily balance specified for your type of Account for that particular monthly cycle. See the accompanying Account Maintenance Information grid for your type Account.

(iii) **TD Simple Savings:** The monthly maintenance fee for TD Simple Savings accounts will be waived in each service charge cycle (a monthly period based on your statement date) that the account meets all of the criteria specified below. This waiver is only available for 12 months from the date you open your account, or 12 months from the date when you switch your account to TD Simple Savings.

a. Your TD Simple Savings account must qualify, as defined below:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| TD Simple Savings<sup>SM</sup> | In good standing | Individual, Primary or Secondary Owner, OR Trust set up with a Social Security Number, or be a Trustee of such a Trust account |

31

b.  We must have on record an eligible, personal TD Bank Checking account linked to your TD Simple Savings account. Eligible accounts you may link include:

| Account Type | Eligibility Requirements | Ownership Requirements |
|---|---|---|
| Personal Checking | In good standing | Individual, Primary or Secondary Owner |
| Personal Checking (Trust) | In good standing | Trust set up with a Social Security Number, or be a Trustee of such a Trust account |

c.  There must have been at least one qualifying transfer into your TD Simple Savings account.

   i.  A qualifying transfer is a recurring transfer of at least $25 from a TD Bank account. Eligible transfers include recurring transfers set up by phone or at a TD Bank Store, or through Online Banking. Transfers set up using ATMs, voice response units, overdraft protection transfers, and sweeps are not eligible.

   ii.  In addition, an Immediate transfer completed through Online Banking will also qualify.

   iii.  To be eligible, your qualifying transfer must post during the period starting the last business day of your previous service charge cycle and ending the second-to-last business day of your current service charge cycle (See example in chart below). Please be aware of the available balance in your accounts – transferring funds from an account with an insufficient balance may result in an Overdraft and a fee may be charged. Please refer to the Overdraft section for details

| | |
|---|---|
| Previous Service Charge Cycle | Monday, April 1 – Tuesday, April 30, 2013 |
| Current Service Charge Cycle | Wednesday, May 1 – Friday, May 31, 2013 |
| Dates you can make a qualifying transfer | Tuesday, April 30 – Thursday, May 30, 2013 |

We will determine whether your account qualifies for this monthly maintenance fee waiver on the second-to-last business day of your current service charge cycle.

(iv) **Monthly Maintenance Fee Discount:** For all personal checking, savings, money market and health savings accounts that are charged a monthly maintenance fee, except for Private Banking Accounts, the monthly fee will be reduced by $1.00 when you choose to stop receiving printed and mailed statements and switch to online statements only. The fee reduction is not applicable to passbook accounts.

5. **Balance Computation Method:** We use the daily balance method to calculate interest on your Account. This method applies a periodic rate to the principal in the Account each day.

6. **Accrual of Interest:** For all deposit accounts (except CDs), interest begins to accrue no later than the Business Day we receive credit for the deposit of non-cash items (for example, checks).

7. **Fees & Charges:** Monthly maintenance fees are shown in the accompanying Account Maintenance Information grid. You agree to pay all fees applicable to the Account including those detailed in the Personal Fee Schedule. You will be notified at least thirty (30) days in advance of any changes to these fees.

8. **Account Opening Bonus Promotions:** From time to time, we may offer cash bonus promotions for opening a new non-interest bearing checking account with an initial deposit of $100 or more. If we are offering such a promotion, and if you open a new non-interest bearing checking account with an initial deposit of at least $100 during the promotional period, you will receive a $25 cash bonus when you open the account. This bonus will be credited to your checking account on the business day it is opened. These promotions cannot be combined with any other offer and are limited to one bonus per Customer. The value of this bonus may be reported to the Internal Revenue Service.

In addition, from time to time, we may offer a TD Bank Visa® Gift Card bonus promotion for opening a new non-interest bearing checking account with an initial deposit of $250 or more. If we are offering such a promotion, and if you open a new non-interest bearing checking account with an initial deposit of at least $250 during the promotional period, you will receive a $25 TD Bank Visa® Gift Card bonus when you open the account. This bonus will be provided on the business day it is opened. These promotions cannot be combined with any other offer and are limited to one bonus per Customer. The value of this bonus may be reported to the Internal Revenue Service.

Also, from time to time, we may offer cash bonus promotions for enrolling in Direct Deposit in conjunction with opening a new non-interest bearing checking account with an initial deposit of $100 or more. If we are offering such a promotion, and if you open a new non-interest bearing checking account with an initial deposit of at least $100 and enroll in Direct Deposit on the spot during the promotional period, you will receive a $25 cash bonus when you open the account. This bonus will be credited to your checking account on the business day it is opened. These promotions cannot be combined with any other offer and are limited to one bonus per Customer. The value of this bonus may be reported to the Internal Revenue Service.

9. **Promotional CD Interest Rates:** From time to time, we may offer Promotional CD interest rates which may have different account opening requirements than our non-promotional (Basic) CD terms. These requirements will be disclosed on the Retail Deposit Rate Sheet. If we are offering such a promotion and you are opening a new account, you must deposit the required initial minimum balance to open the account in money not already on deposit at TD Bank to qualify. If we are offering such a promotion and you have a renewing CD, you may be eligible for the promotional rate by making a deposit of new to bank money to the renewing CD that is equal to or greater than the new account minimum balance requirement. Maximum deposit limits may apply.

Promotional CDs will automatically renew at maturity to the same term at the non-promotional (Basic) CD interest rate and APY in effect at the time of renewal unless we notify you otherwise. Promotional CD interest rates and/or Special Offers apply only until the promotional CD's first maturity date.

10. **Grand Opening Bonus CD Rate:** We may offer a special Grand Opening Bonus CD rate at new TD Bank Store locations. If we are offering such a promotion, you must deposit the required initial minimum balance to open the account in money not already on deposit at TD Bank to qualify. The maximum deposit is $1,000,000. The offer is valid for new CD accounts only and does not include IRA CDs. A TD Bank personal checking account is required.

Grand Opening Bonus CDs will renew at maturity to the same term at the non-promotional (Basic) CD interest rate and APY in effect at the time of renewal unless we notify you otherwise. Grand Opening Bonus CD interest rate and/or Special Offers apply to the initial CD term only.

11. **Additional Deposits ("IRA Add-Vantage CD" only):** You may make additional deposits of not less than $500.00 per deposit at any time during the term up to a maximum of $250,000 in additional deposits.

## Part III: Funds Availability Policy

Your ability to withdraw funds you have deposited at the Bank will be determined according to this policy.

This disclosure applies to all transaction accounts such as Checking and Interest Bearing Checking Accounts, and to Money Market, Savings, and Time Accounts.

The Bank's general policy is to make funds from your deposits available to you no later than the first (1st) Business Day after the day we receive your deposit. Electronic direct deposits and wire transfers will be available on the day we receive the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

### Determining the Availability of a Deposit

To determine the availability of your deposits, every day is a Business Day, except Saturdays, Sundays and federal holidays. On Business Days that we are open, the earliest time that we stop accepting deposits in our Stores for same-day credit is 8pm Thus, if you make a deposit with a bank teller before 8pm on a Business Day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 8pm or on a day we are not open, we will consider that the deposit was made on the next Business Day we are open.

If you mail funds to us, the funds are considered deposited on the Business Day we receive them. Funds deposited in a night depository or Store lockbox are considered deposited on the next Business Day the Bank or Store lockbox is open.

If you make a deposit at a Bank ATM before 8pm on a Business Day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit at a Bank ATM after 8pm or on a day we are not open, we will consider that the deposit was made on the next Business Day we are open. Funds from any deposits (cash or checks) made at ATMs we do not own or operate may not be available until the fifth (5th) Business Day after the day of your deposit.

The length of the delay varies depending on the type of deposit and is explained below:

### Same Day Availability

Funds from the following deposits are available on the same day they are deposited:

- Cash deposits made at the Bank's teller station;
- Funds received for deposit by an electronic payment (including ACH credits and transfers);
- Wire transfers;
- $100.00 from non-cash deposits made at the Bank's teller station;
- $100.00 from deposits made at the Bank's ATM (for accounts opened longer than 90 days).

### Longer Delays May Apply

In some cases, we will not make all the funds that you deposit by check available at the times shown in this Policy.

Depending on the type of check you deposit, funds may not be available until the second (2nd) Business Day after the day of your deposit. The first $200 of your deposit, however, will be available no later than the first (1st) Business Day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the first (1st) Business Day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our

employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit. If you will need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds deposited by check may be delayed for a longer period under the following circumstances:

- you deposit checks totaling more than $5,000 on any one day (Note: The first $200 will be made available no later than the first (1st) Business Day after the day of your deposit);

- we believe a check you deposited will not be paid;

- you re-deposit a check that has been returned unpaid;

- you have overdrawn your Account repeatedly, or would have overdrawn your account if checks had been honored in the last six (6) months;

- there is an emergency, such as failure of communications or computer equipment. (Note: The first $200 will be made available no later than the first (1st) Business Day after the day of your deposit).

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh (7th) Business Day after the day of your deposit.

## Special Rules For New Accounts

If you are a new Customer, the following special rules may apply during the first thirty (30) days your account is open.

- Funds from in-Store cash deposits, electronic direct deposits, and wire transfers to your Account will be available on the day we receive the deposit.

- The first $100 of your daily in-Store non-cash deposits will be available to you on the day we receive the deposit.

- Funds from the first $5,000 of a day's total deposits of cashier's, certified, teller's, and federal, state, and local government checks will be available on the first (1st) Business Day after the day of your deposit.

- The excess over $5,000 and funds from all other check deposits will be available no later than the seventh (7th) Business Day after the day of your deposit.

For new Customers using an ATM, the following additional special rules may apply during the first ninety (90) days your account is open.

- Cash deposits and the first $100 of a check deposit made at a TD Bank ATM will be available to you on the first (1st) business day after the day of your deposit.

- Cash deposits made at an ATM the Bank does not own or operate will be available no later than the fifth (5th) business day after the day of your deposit.

- Check deposits made at an ATM the Bank does not own or operate will be available no later than the seventh (7th) business day after the day of your deposit.

## Holds on Other Funds

If we accept for deposit or we cash a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately, but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another Account with us. The funds in the other Account would then not be available for withdrawal in accordance with the time periods that are described in this policy.

## Non-U.S. Financial Institutions

We reserve the right to send any checks drawn on a foreign financial institution (including Canadian financial institutions) for collection. For each item sent, we will assess a collection charge plus any collection fees charged to us by other financial institutions which process the item as listed in our most recent Personal Fee Schedule. While the funds represented by checks that are sent for collection are generally available within thirty (30) Calendar Days or subject to payment by the Drawee bank, items sent for collection will be credited to your Account in U.S. dollars, with the amount of U.S. dollars credited calculated using our applicable exchange rate that is in effect on the date when we credit the funds to your Account and not when the deposit is made. If we do not enter any item (Canadian only) for collection, the funds will be available no later than the third (3rd) Business Day after the day of deposit.

## Checks or Other Items Returned Subsequent to Funds Being Made Available

If a check or other item you deposited to your Account is returned to us unpaid after the funds have been made available to you, the amount of the check or other item will be deducted from your Account. If there are insufficient funds in your Account, we reserve the right to demand payment directly from you and to charge you for the overdraft as posted in our most recent Personal Fee Schedule.

## Endorsements

Endorsements on items deposited to your Account are restricted, under federal law, to the first 1.5 inches of the back of the check. The remaining portion of the check is reserved for endorsements by banks. Your endorsement should contain your signature, the words "For Deposit Only," and your Account number. Improper endorsements may delay the check collection process and the subsequent crediting and availability of funds. While we may accept non-conforming endorsements, you agree you will be responsible for any losses.

## Part IV: Electronic Funds Transfers Disclosure

The Electronic Funds Transfers ("EFT") we are capable of handling are indicated below. Some of these may not apply to your Account. Please read this disclosure carefully because it tells you your rights and obligations for these transactions. You should keep this notice for future reference.

Use of your ATM or Visa Debit Card may be restricted in certain countries due to security risks.

For security purposes, your card may be cancelled after 13 months of inactivity, except for Health Savings Account Debit Cards, which may be cancelled after 36 months of inactivity.

### Direct Deposits

You may make arrangements for certain direct deposits to be accepted into your Checking, Savings or Money Market Deposit Accounts.

### Pre-authorized Withdrawals

You may make arrangements to pay certain recurring bills from your Checking, Statement Savings or Statement Money Market Deposit Accounts.

### Telephone Transfers

You may make arrangements to have telephone transfers between eligible Checking, Statement Savings or Statement Money Market Deposit Accounts through our telephone banking system.

### Electronic Check Conversions

Some Point-of-Purchase terminals may provide you the option of initiating a one-time automatic debit from your Account by authorizing the merchant to obtain the necessary information from a check drawn on your deposit account. A check used in this way is treated as an EFT and is not a negotiable instrument in its own right. The check cannot be subsequently used and should be voided.

You may authorize a merchant or other payee to make a one-time electronic payment from your Checking Account using information from your check to:

(i)  Pay for purchases

(ii) Pay bills

### ATM Transaction Types

You may access your Account(s) by ATM using your ATM card or Visa Debit Card and Personal Identification Number (PIN) to:

- make deposits to Checking, Statement Savings, and Statement Money Market Accounts at TD Bank ATMs;

- get cash withdrawals and/or transfer funds from and between Checking, Statement Savings, and Statement Money Market Accounts linked to your card;
- make envelope-free deposits at many TD Bank ATMs;
- get information about the Account balance(s) in the Checking, Statement Savings, and/or Statement Money Market Account(s) linked to your card.

**Note:** Some of these services may not be available at all terminals.

### Visa Debit Card Transaction Types

In addition to the ATM transaction types listed above, with your Visa Debit Card, you may:

- purchase goods online, via phone or in person, or pay for services wherever Visa Debit Cards are accepted;
- get cash from a merchant, if the merchant permits, or from a participating financial institution.

**Note:** If a merchant receives authorization for a purchase, TD Bank cannot return that transaction unpaid even if your account is not in good standing.

### Visa Debit Card Limits

The standard daily limits (per card) are:

- ATM cash withdrawals – $750;
- POS (PIN) transactions – $2,000;
- Visa signature transactions and Visa cash advances – $5,000 each.

### Visa Platinum Debit Card Limits

The standard daily limits (per card) are:

- ATM cash withdrawals – $1,000;
- POS (PIN) transactions – $2,000;
- Visa signature transactions – $10,000;
- Visa cash advances – $5,000.

### ATM Card Limits

The standard daily limits (per card) are:

- ATM cash withdrawals – $750;

### Personal Identification Number (PIN)

The PIN issued to you is for your security purposes. The numbers are confidential and should not be disclosed to third parties or recorded on the card. You are responsible for safekeeping your PIN(s). You agree not to disclose or otherwise make your PIN available to anyone not authorized to sign on your Account.

### Termination

You may terminate the Electronic Funds Transfer Agreement by calling us and subsequently providing written notice. The Bank may terminate the Electronic Funds Transfer Agreement by notifying you in writing.

## Charges For Electronic Funds Transfers

We may impose a fee, as disclosed on the Personal Fee Schedule, for personal account transactions you conduct at an ATM that we do not own or operate. Such transactions are referred to as "non-TD" ATM transactions. Fees imposed by TD Bank for non-TD ATM transactions will be reflected in your monthly statement. For certain account types we will waive the fee for some non-TD ATM transactions as disclosed on the Personal Fee Schedule.

**Please note:** For non-TD ATM transactions, the institution that owns the ATM (or the network) may assess a fee (surcharge) at the time of your transaction, including for balance inquiries. For some Checking Account types, we will reimburse you for these fees at the end of each statement cycle as disclosed on the Personal Fee Schedule.

**International ATM Surcharge Fee for Accounts that Qualify for Surcharge Refunds:** When we process an international ATM transaction and the fee is presented separately, we will refund the ATM surcharge fee assessed. If we do not receive the fee separately, we will refund the surcharge fee assessed if you bring us your ATM receipt within 90 calendar days of the transaction. Reimbursement is subject to the balance requirements as disclosed on the Personal Fee Schedule.

**International ATM Card or Visa Debit Card Transactions:** The exchange rate between the transaction currency and the billing currency used for processing international ATM Card or Visa Debit Card transactions is a rate selected by Visa from the range of rates available in wholesale markets for the applicable central processing date, which may vary from the rate Visa itself receives, or the government-mandated rate in effect for the applicable central processing date.

## Right To Documentation

### Terminal Transactions

You can get a receipt at the time you conduct a transaction using automated teller machines or point-of-sale terminals, unless your transaction totals $15.00 or less.

### Direct Deposits

If you have arranged to have direct deposits made to your Account at least once every sixty (60) Calendar Days from the same person or company, you can call us at **1-888-751-9000** to find out whether the deposit has been made. With the exception of Passbook Savings Accounts, if the only possible transfers to or from your Account are direct deposits, you will get a monthly statement from us.

### Periodic Statements

You will get a monthly Account statement from us for your Checking, Statement Savings, and/or Statement Money Market

Accounts unless there are no checks written or no electronic transfers in a particular month. If your Account is not a Holiday Club, Club Saver, IRA, Passbook or CD Account, in all cases you will receive a statement at least quarterly, unless we determine that your Account has been inactive for more than one year.

### Passbook Accounts Where the Only Possible Electronic Funds Transfers Are Direct Deposits

If you bring your passbook to us, we will record any electronic deposits that were made since the last time you brought in your passbook. Passbook accounts are not available in all states.

### Notice of Varying Amounts

If these regular payments may vary in amount, the person (or organization) you are going to pay will tell you, at least ten (10) Calendar Days before each payment, when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

## Stop Payment Procedures and Notice of Varying Amounts

### Right to Stop Payment and Procedures for Doing So

Pre-authorized transfers from your Account(s) can be discontinued, for a fee (see Personal Fee Schedule), by calling us at **1-888-751-9000** or by writing to:

Transaction Services Department
P.O. Box 1377
Lewiston, ME 04243-1377

To be effective, a stop payment request must be received at least three (3) Business Days prior to the regularly scheduled payment date, and must precisely identify the account number, date and amount of the payment, and the payee.

Your stop payment request will be effective after the request has been received by the Bank and the Bank has had a reasonable opportunity to act on it. If your stop payment request has been made orally, the Bank will send you a written confirmation. If your stop payment request is made in writing, you must use a form that is supplied by the Bank; this form will constitute written confirmation of your request. In either case, it is your responsibility to ensure that all of the information supplied on your written confirmation is correct and to promptly inform the Bank of any inaccuracies.

Unlike checks, you cannot place stop payments for purchases made by telephone, on the Internet, or with your Visa Debit Card.

## Liability for Failure to Stop Payment of Pre-authorized Transfer

If you order us to stop one of these payments three (3) Business Days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

### Additional Information Required By Massachusetts Law

1. Any documentation provided to you which indicates an electronic fund transfer was made shall be admissible as evidence of the transfer and shall constitute prima facie proof that the transfer was made.

2. Unless otherwise provided in the Agreement, you may not stop payment of electronic fund transfers, therefore you should not employ electronic access for purchases or services unless you are satisfied that you will not need to stop payment.

### Customer Safety Information Required By New York Law

Each time you use an Automated Teller Machine (ATM) keep the following safety tips in mind:

(a) The activity of the ATM facility is being recorded by a surveillance camera or cameras;

(b) Close the entry door completely upon entering and exiting;

(c) Do not permit any unknown persons to enter after regular banking hours;

(d) Place withdrawal cash securely upon your person before exiting the ATM facility.

Complaints concerning security in the ATM facility should be directed to your bank's security department at **1-888-751-9000** or NYS at 1-877-BANK-NYS, and the nearest available public telephone should be used to call the police if emergency assistance is needed.

### Customer Safety Information Required By New Jersey Law

Please keep the following safety tips in mind while using an automated teller machine:

(a) Be alert to your surroundings and to defer transactions if circumstances cause you to be apprehensive for your safety;

(b) Close the entry door of any automated teller machine (ATM) facility equipped with a door;

(c) Place withdrawn cash securely on your person before exiting any ATM facility

You should direct any complaints concerning automated teller machine security to the Corporate Security and Investigations Department of TD Bank at **1-888-751-9000** or to the New Jersey Department of Banking at 1-609-272-7272.

## Our Liability

If we do not complete a transfer to or from your Account on time or in the correct amount according to our Agreement with you, we will be liable for losses or damages. However, there are some exceptions. We will NOT be liable for instance:

1) If, through no fault of ours, you do not have enough money in your Account to make the transfer.

2) If the transfer would go over the credit limit on your overdraft line.

3) If the automated teller machine where you are conducting the transfer does not have enough cash.

4) If the terminal or system was not working properly and you knew about the breakdown when you started the transfer.

5) If circumstances beyond our control prevent the transfer, despite reasonable precautions we have taken. Such circumstances include telecommunications and power outages or interruptions, postal strikes, delays caused by payees, fires and floods.

6) If the funds are subject to legal process or other encumbrances restricting such transfer.

7) If the transfer would result in your daily withdrawal limit being exceeded.

8) If the Bank has reason to believe that you or someone else is using the automated teller machine or other electronic banking service for fraudulent or illegal purposes.

9) If you do not give proper, complete or correct instructions for the transfer, or you do not follow the procedures in this Agreement or any other Agreement with us for requesting the transfer.

10) If your ATM or Visa Debit Card and/or your PIN has been reported lost or stolen, or we have canceled your PIN, your card, or otherwise terminated this Agreement.

There may be other exceptions stated in our Agreement with you.

## Disclosures of Account Information To Third Parties

In order that your privacy may be protected, we will not disclose any information about you or your Account to any person, organization, or agency except:

1) for certain routine disclosures necessary for the completion of a transfer or to resolve errors; or

2) for verification of the existence and condition of your Account for a credit bureau or merchant; or

3) to persons authorized by law in the course of their official duties; or

4) to our employees, auditors, service providers, attorneys or collection agents in the course of their duties; or

5) pursuant to a court order or lawful subpoena; or

6) to a consumer reporting agency; or

7) to certain third parties with whom we have joint marketing agreements; or

8) to our affiliates as permitted by law; or

9) by your written Authorization which, for Massachusetts customers only, shall automatically expire forty-five (45) days after our receipt of your authorization.

For Massachusetts customers only: If an unauthorized disclosure has been made, we must inform you within three (3) days after we have discovered that an unauthorized disclosure has occurred.

## Unauthorized Transfers

Tell us AT ONCE if you believe your card, your PIN, or both been lost, stolen or used without your permission, or if you believe that an electronic funds transfer has been made without your permission using information from your check. You could lose all the money in your Deposit Account, plus your available overdraft protection. Telephoning is the best way of keeping your possible losses down. If you notify us within two (2) Business Days after you learn of the loss or theft of your card or PIN, you can lose no more than $50 if someone uses your card or PIN without your permission. If you do not notify us within two (2) Business Days after you learn of the loss or theft of your card or PIN, and we can prove we could have prevented someone from using your Card and/or PIN without your permission if you had told us, you could lose as much as $500 ($50 if you are a resident of Massachusetts and this Agreement is governed by Massachusetts law). You will not be liable for unauthorized purchases made with your Debit Card when used as if it were a Visa Credit Card. However, you can be held liable for fraudulent use of your Card and/or PIN when PIN-based transactions are made with your ATM or Debit Card.

Also, if your statement shows transfers that you did not make, notify us at once. If you do not notify us within sixty (60) Calendar Days after the statement was mailed to you, you may not get back any money you lost after the sixty (60) Calendar Days if we can prove that we could have stopped someone from taking the money if you had told us in time. (If you are a resident of Massachusetts and this Agreement is governed by Massachusetts law, the maximum amount of money you could lose is $50.) If a good reason (such as a long trip or hospital stay) kept you from notifying us, we will extend the time periods.

If you believe your card and/or your PIN has been lost or stolen, someone has transferred or may transfer money from your Account without your permission, or a transfer has been made using the information from your check without your permission, call us at **1-888-751-9000**, or write:

Customer Service Department
Mail Stop NJ5-002-215
6000 Atrium Way
Mt. Laurel, NJ 08054

Business Days: Monday through Friday, excluding federal holidays.

### In Case Of Errors Or Questions About Your Electronic Funds Transfer

If you need information about an electronic funds transfer or if you believe there is an error on your bank statement or receipt relating to an electronic funds transfer, telephone the Bank immediately at **1-888-751-9000** or write to:

Transaction Services Department
P.O. Box 1377
Lewiston, ME 04243-1377

We must hear from you no later than sixty (60) Calendar Days after we sent you the FIRST statement on which the problem or error appeared. When contacting the Bank, please provide us with the following information:

1) Tell us your name and Account number.

2) A description of the error or transaction you are unsure about. Please explain as clearly as you can why you believe there is an error or why more information is needed.

3) The dollar amount of the suspected error.

When making a verbal inquiry, the Bank may ask that you send us your complaint in writing within ten (10) Business Days after the verbal inquiry. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) Business Days, we may not provisionally credit your Account.

We will complete our investigation within ten (10) Business Days after we hear from you (or within twenty (20) Business Days after we hear from you if your notice relates to a transfer that occurred within thirty (30) Calendar Days after your first deposit to the Account). If we need more time, however, we may take up to forty-five (45) Calendar Days to investigate your complaint or question. We may take up to ninety (90) Calendar Days to investigate your complaint or question if it relates to a transaction you initiated through point-of-sale, from outside the United States, or a transaction which occurred within thirty (30) Calendar Days after your first deposit to the Account. If we decide to do this, we will credit your Account for the amount you think is in error within ten (10) Business Days (or, twenty (20) Business Days if your complaint or question relates to a transfer which occurred within thirty (30) Calendar Days after your first deposit to the Account), so that you will have use of the money during the time it takes us to complete our investigation.

We will correct any error promptly after we complete our investigation. We will send you a written explanation within three

45

(3) Business Days after completing our investigation. You may ask for copies of the documents that we used in our investigation and we must make these available to you for inspection.

## Part V: Substitute Checks and Your Rights

### What is a substitute check?

To improve the way checks are processed, federal law permits banks to replace original checks with "substitute checks". These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check. Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other law with respect to those transactions.

### What are my rights regarding substitute checks?

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your Account (for example, if you think that we withdrew the wrong amount from your Account or that we withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, bounced check fees). The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You are also entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law. If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your Account earns interest) within 10 Business Days after we received your claim and the remainder of your refund (plus interest if your Account earns interest) not later than 45 Calendar Days after we received your claim. We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your Account.

### How do I make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your Account, please contact us at **1-888-751-9000**. You must contact us

within 40 Calendar Days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the Account statement showing that the substitute check was posted to your Account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances. Your claim must include:

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);

- An estimate of the amount of your loss;

- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and

- A copy of the substitute check and/or the following information to help us identify the substitute check: check number, the name of the person to whom you wrote the check, the amount of the check and the date posted on your statement.

## Part VI: Night Depository Agreement

This Agreement governs the use of the night depository service of TD Bank, N.A. after September 1, 2011. By using this service after September 1, 2011, you agree to the terms of this Agreement. In this Agreement, the terms "you" and "your" refer to the Depositor and the terms "we", "us" and "our" refer to TD Bank, N.A.

### Bags And Containers

a)  Disposable Bags – Effective September 1, 2011, all new Depositors using the night depository service must make deposits using the two-part disposable bags supplied by us or by our vendor. The bags must only be used for the deposit of currency, coin and negotiable instruments owned by you.

b)  Locking Bags, Zipper Bags, Envelopes and Other Containers – Existing Depositors using the night depository service may continue to use their existing locking bags, envelopes or other containers.

c)  All Bags, Envelopes and Containers – You must record the contents of each bag, envelope or container on a deposit slip supplied or approved by us and place the deposit slip in the bag, envelope or container.

### Method Of Deposit

Deposits made pursuant to this Agreement are to be either (i) placed in a night depository facility ("night depository") at one of our offices, or (ii) given directly to our employee at one of our offices during regular business hours without waiting for our employee to verify the amount of the deposit ("subject to count deposit"), or (iii) delivered to us via an armored carrier or by a courier service (a "Carrier").

47

### Receipt Of Bags And Keys

You acknowledge receipt of any bank-supplied bags and any keys necessary to operate the exterior door of the night depository. Any lost keys must be reported to us immediately.

### Third Party Carriers

We may arrange for and pay for a Carrier to collect deposits from you and deliver the deposits to us for processing. For any deposits made via a Carrier, you acknowledge and agree that (i) we do not own or control the Carrier, the Carrier's employees or the Carrier's facilities; (ii) the Carrier retains discretion to determine what customers and geographic areas it will serve and maintains the ultimate responsibility for scheduling, movement and routing; (iii) the Carrier acts as your exclusive agent when items are in transit and is responsible for the bags and their contents during transit; and (iv) the Carrier is responsible for maintaining adequate insurance covering theft, employee fidelity and other in-transit losses. The items transported by the Carrier are considered deposited only when actually received by us and verified and credited to your account.

### Liability of Bank

You expressly agree that the use of the night depository service is at your own risk. We will not be responsible for any loss or damage sustained by you in the use of the night depository service resulting from any cause whatsoever, including mechanical defects or a malfunction of the night depository itself, unless such loss or damage is directly caused by our negligence or willful misconduct. In no event will we be liable for damages resulting from causes beyond our control or for consequential, special or punitive damages or for any lost profits.

### Contents Not Insured

We do not insure the contents of any bag, envelope or container.

### Processing Deposits

You give us authority to open the bags and process for deposit any coin, currency or negotiable instruments found in the bags. You acknowledge and agree that the deposit slip you provide is not conclusive as to the contents of the bags and the determination of our employee is conclusive as to the contents of the bags. Our Funds Availability Policy, as it may be amended from time to time, applies to all deposits. We may take up to two Business Days following the day the bag is received to count the cash in the bag and to credit your account based on our verified cash count. We will use ordinary care and adhere to the reasonable commercial standards of the banking business in connection with the receipt and processing of the contents of the bags.

### Fees And Service Charges

You agree to pay all fees associated with this service as described in the Personal Fee Schedule. We may change those fees from time to time by giving you notice of such changes in the manner specified in the Deposit Account Agreement or as may be required by applicable law.

### Termination

This Agreement may be terminated by either you or by us immediately by giving oral or written notice to the other. Upon termination of this Agreement, you agree to return any key(s) to the night depository facility.

### Entire Agreement; Conflict Of Terms: Governing Law

This Agreement constitutes the entire agreement between you and us with respect to the use of the night depository service. In the event of any conflict between any provision of this Agreement and any provision of the Deposit Account Agreement relative to the night depository service, the provision of this Agreement shall control. This Agreement shall be governed by the state laws that apply to your primary deposit account.

## General Information

1-888-751-9000

www.tdbank.com



**America's Most Convenient Bank®**

Member FDIC   TD Bank, N.A. | Equal Housing Lender     62-7340 (06/13)