**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DAVID ANDRICHYN, et al.,           :
                                   :
               Plaintiffs,         : CIVIL ACTION
                                   :
        vs.                        :
                                   : No. 14-CV-3863
TD BANK, N.A.,                     :
                                   :
               Defendant.          :

**MEMORANDUM**

**JOYNER, J.**                              **MARCH 19, 2015**

Before the Court are Defendant's Motion to Dismiss (Doc. No. 23), Plaintiffs' Response in Opposition thereto (Doc. No. 25), and Defendant's Reply in Further Support thereof (Doc. No. 27). For the reasons below, the Motion to Dismiss is GRANTED. An Order follows.

## I. BACKGROUND

This putative class action arises from Defendant TD Bank's processing of debits from so-called "payday lenders." Plaintiffs claim that TD's conduct violated (1) its contractual duties, (2) New York and Pennsylvania common law, and (3) those states' consumer protection laws.

Payday loans are short-term, high-interest loans that are "among the most controversial credit products in the marketplace." Nathalie Martin, 1,000% Interest-Good While Supplies Last: A Study of Payday Loan Practices and Solutions, 52 Ariz. L. Rev. 563, 564 (2010). In essence, the loans are intended "to tide a consumer over

1

until payday, and then be paid back in one lump sum when the consumer receive[s] her paycheck." Id. They generally operate in two ways. First, the borrower can "write a personal check payable to the lender for the amount the person wants to borrow, plus the fee they must pay for borrowing. The company gives the borrower the amount of the check less the fee, and agrees to hold the check until the loan is due, usually the borrower's next payday." Federal Trade Commission, Payday Loans; Consumer Information, (March 2008), http://www.consumer.ftc.gov/articles/0097-payday-loans.   In   the alternative, the lender can "deposit[] the amount borrowed — less the fee — into the borrower's checking account electronically. The loan amount is due to be debited the next payday." Id. If the borrower wishes to extend or "roll over" the loan to the next payday, she is charged another set of fees. Id. In most cases, the interest rates on these loans (calculated based on the borrowing fee) exceed 100% APR, and in some circumstances can reach 1000% APR. See id.; Martin, supra, at 564-65.

The legality of these loans depends on the laws of the state in which the loan transactions occur. See generally Mary Spector, Taming the Beast: Payday Loans, Regulatory Efforts, and Unintended Consequences, 57 DePaul L. Rev. 961 (2008). Of note here, both Pennsylvania and New York have laws that prohibit high-interest loans. See Cash Am. Net of Nev., LLC v. Commw. of Pa., 978 A.2d 1028 (Pa. Commw. Ct. 2009), aff'd, 8 A.3d 282 (Pa. 2010)

(discussing the application of Pennsylvania's lending laws to payday lenders); <u>Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.</u>, 769 F.3d 105 (2d Cir. 2014) (examining the application of New York's usury laws to payday lenders). Besides several generally applicable lending laws (such as the Truth In Lending Act), efforts by the federal government to curb payday lending have so far only extended to military personnel and their families. <u>See</u> Spector, <u>supra</u>, at 978-79. Plaintiffs allege that many payday lenders are based offshore or on Native American reservations and conduct their business over the internet in an attempt to avoid the application of state and federal laws. Complaint, Doc. No. 1, at ¶ 4.

The named Plaintiffs in this matter are banking customers of TD Bank who applied for and received payday loans from several out-of-state lenders. Plaintiff David Andrichyn is a resident of Lansdale, Pennsylvania, and Plaintiff Gladstone Williams is a resident of Fresh Meadows, New York. Id. at ¶¶ 16, 17

Andrichyn alleges that in December of 2012 he took out a $350 loan from GR Enterprises, operating at www.signmyloan.net. Id. at ¶ 101. The nominal APR for the loan was 995.45%. Id. at ¶ 102. On December 14, 2012 the lender initiated a debit of $106 from Andrichyn's TD account. Id. at ¶ 103. TD Bank processed the debit even though Andrichyn's account already held a negative balance. Id. Three days later, the debit was returned and TD charged

Andrichyn a $35 overdraft fee. Id. This process was repeated a week later. Id. at ¶ 104. On December 24, 2012, the lender initiated another $106 debit and this time Andrichyn's account held sufficient funds. Id. at ¶ 105. The lender initiated further debits on December 28, 2012 ($106); January 11, 2013 ($106); January 25, 2013 ($106); and February 8, 2013 ($281). Id. at ¶¶ 106-110. In sum, Andrichyn alleges that $705 was taken from his account by TD Bank at the request of GR Enterprises. Id. at ¶ 110.

Throughout 2013, Plaintiff Williams took out payday loans from various lenders under circumstances similar to those of Mr. Andrichyn. The lenders, loan amounts, and nominal interest rates were as follows: (1) JD Marketing Group — $300 at 995.45%; (2) Hydra Financial Limited Fund III — $300 at 730%; (3) EZPaydayCash — $400 at 500%; (4) 500FastCash — $350 at 720%; (5) Cash Jar — $450 at 100%; (6) 247GreenStreet — $1,120 at 366%. Id. at ¶¶ 112-151. Plaintiffs allege that TD processed the debits from these lenders without challenge and assessed fees for overdrafts when they occurred. Id.

Understanding Plaintiffs' claims against TD requires an understanding of how electronic debits are processed. Electronic debits and credits are generally made through a system called the "ACH Network." NACHA, <u>ACH Network: How it Works</u>, https://www.nacha.org/ach-network (last visited February 18, 2015). It works as follows: first, an "Originator" (here, the payday

4

lender) initiates a debit or credit request through the ACH Network. <u>Id.</u> Next, the Originator's bank, known as an "Originating Depository Financial Institution" or "ODFI" aggregates various ACH transactions into batches and transmits them to an "ACH Operator."[1] <u>Id.</u> The Operator sorts the transactions and makes them available to the "Receiving Depository Financial Institution" or "RDFI" (here, TD Bank). <u>Id.</u> The RDFI then debits or credits the account of an individual or business, known as the "Receiver" (here, the Plaintiffs). <u>Id.</u> This system moves almost $39 trillion per year in approximately 22 billion individual electronic transactions. <u>Id.</u>

The ACH Network is operated by the Electronic Payments Association, known as "NACHA." <u>Id.</u> NACHA operates as both an administrator of the network and a trade organization that advocates on the network's behalf. NACHA, <u>About NACHA</u>, https://www.nacha.org/about (last visited February 18, 2015). Relevant here, NACHA also promulgates a set of operating rules which "provide the legal foundation for the ACH Network." <u>Id.</u>

Plaintiffs allege that TD Bank violated the NACHA Rules, its contracts with Plaintiffs, and various state laws by acting as an RDFI for the ACH transactions initiated by the payday lenders. Plaintiffs also claim that TD's assessment of overdraft fees generated as a result of these transactions further violates the

---

[1] Either The Federal Reserve or The Clearing House, a private-sector ACH operator. <u>See</u> The Clearing House, <u>Operations and Service</u>, https://www.theclearinghouse.org/payments/ach/operations-and-service (last visited February 18, 2015).

parties' contracts and state law. In the instant Motion, TD moves to dismiss the Plaintiffs' Complaint for failure to state a claim.

## II. STANDARD OF REVIEW

Under Rule 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require "detailed factual allegations," it does demand "more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Thus "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a claim suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (citation omitted) (second alteration in original) (quoting Twombly, 550 U.S. at 555, 557 (2007)).

"The touchstone of the pleading standard is plausibility." Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Ethypharm S.A. Fr. v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013)(quoting Sheridan v. NGK Metals Corp., 609 F.3d 239, 262, n. 27 (3d Cir. 2010)). A court determining the sufficiency of a complaint should take note of the

6

elements a plaintiff must plead to state a claim, identify the conclusions that are not entitled to the assumption of truth, and "'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" Connelly v. Steel Valley Sch. Dist., 706 F.3d 209, 212 (3d Cir. 2013)(quoting Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011)).

## III. DISCUSSION

### A. Choice of Law

Though neither party addresses this issue in their briefing, we must determine what substantive law to apply to Plaintiffs' common-law claims. "A federal court sitting in diversity applies the choice-of-law rules of the forum state ... to determine the controlling law." Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202, 206 (3d Cir. 2013) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941)). Thus Pennsylvania's choice of law rules control.

Where parties have contracted for the application of a certain forum's law, Pennsylvania courts will generally honor that decision.[2] Cottman Transmission Sys., Inc. v. Melody, 869 F. Supp. 1180, 1183 (E.D. Pa. 1994); see also Restatement (Second) of Conflict of Laws § 187. Here, the contract between TD and the

---

[2] While there are exceptions to this general rule, we see no reason why they would apply here.

Plaintiffs states that it "is governed by the laws of the jurisdiction in which the Store where you opened your Account is located." <u>See</u> Compl. Ex. A. at 24 (Doc. No. 1 at 75 of 101). "Store" is defined as a TD Bank branch. Id. at 2. Though the Plaintiffs have not provided us with details as to the location of the TD branches where they opened their accounts, a safe assumption is that each opened an account within their home state. Thus, per the contract, Plaintiff Andrichyn's claims (and those of the Pennsylvania putative class) should be governed by Pennsylvania law, and Plaintiff Williams's claims (and those of the New York putative class) should be governed by New York law.

However, we recognize that in consumer class actions choice of law questions are hardly ever so cut-and-dried. This is partly due to the Third Circuit's decision in <u>Georgine v. Amchem Products, Inc.</u> which held that "we must apply an individualized choice of law analysis to each plaintiff's claims." 83 F.3d 610, 627 (3d Cir. 1996), <u>aff'd sub nom.</u>, <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 117 (1997). This can cause a "proliferation of disparate factual and legal issues" and can ultimately defeat class certification. <u>Id.</u> But at this early stage it is not necessary to resolve the question definitively, especially where the parties have failed to address it. <u>See, e.g.</u>, <u>In re Flonase Antitrust Litig.</u>, 815 F. Supp. 2d 867, 880 n. 10 (E.D. Pa. 2011) (explaining the Court's decision to defer a class-wide choice of law

8

determination until after the completion of fact discovery). Instead, we will give Plaintiffs ample opportunity to plead a plausible claim for relief by examining the law of each state, and determining whether a claim can go forward under either.[3]

## B. Breach of Contract

The Plaintiffs' first claim against TD is for breach of contract. In Pennsylvania, "a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)). Similarly, under New York law, a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). As there is no indication in the Parties' briefing that the Plaintiffs failed to perform any contractual obligations, and as there exists no common-sense basis to believe that such nonperformance occurred, we will analyze these claims under a basic tripartite framework and assess whether Plaintiffs have adequately alleged the existence of (1) a contract,

---

[3] We note as well that this is consistent with the Parties' briefing, as both have cited to precedent from each state.

(2) a breach of that contract, and (3) resultant damages.

The contract at issue between the parties is TD's "Personal Deposit Account Agreement" (hereinafter "Account Agreement" or "Agreement") which governs the deposit relationship between TD and its customers. See Compl. Ex. A., Doc. No. 1 at 50 of 101. Neither party has contested the validity of this contract or its application to this dispute.

Plaintiffs claim that TD breached the Account Agreement in three ways. First, they claim that TD breached the express terms of the Agreement by processing the allegedly unlawful debits. Second, Plaintiffs claim that the same conduct constitutes a violation of the NACHA Rules, which they argue were incorporated into the Account Agreement. Third, Plaintiffs claim that TD breached the Agreement by assessing overdraft fees generated by the processing of the allegedly unlawful transactions. We address each of the alleged breaches in turn.

Plaintiffs first allege that "[t]he Account Agreement [] provided TD Bank with the contractual obligation to block transactions it knew or believed to be unlawful." Compl. at ¶ 168. Thus, they argue, by processing the debit requests from the payday lenders, TD violated the express terms of the agreement. Id. However, Plaintiffs fail to cite any provision in the Account Agreement that would create this obligation. The only provision Plaintiffs cite that could arguably fit this description states

10

that TD "may block or otherwise prevent or prohibit" a "suspected restricted transaction." Compl. at ¶ 44 (quoting Account Agreement at 3). But Plaintiffs fail to realize that this passage refers only to "'restricted transactions' as defined in the Unlawful Internet Gambling Enforcement Act of 2006." Account Agreement at 2. As one might imagine, that statute deals only with gambling, and has no application to the facts presented here. See 31 U.S.C. §§ 5362(7), 5363. This portion of Plaintiffs' breach claim cannot proceed.

The bulk of Plaintiffs' breach claim centers around their argument that TD's conduct violated the NACHA Rules, which Plaintiffs claim were incorporated into the Account Agreement. See Compl. at ¶ 166-67. In order to address this claim we must first determine whether the NACHA rules were in fact incorporated. In support of this point, Plaintiffs cite to page 16 of the Account Agreement, which states in relevant part:

> **International ACH and Wire Transactions**
> If your Account receives incoming ACH transactions (either credits or debits) or wire transfers initiated from outside of the United States, both you and we are subject to the Operating Rules and Guidelines of the National Automated Clearing House Association ("NACHA") or the rules of any wire transfer system involved ....

As TD points out, this provision does not refer to all ACH transactions, but rather only to those initiated from outside of the United States. Motion to Dismiss at 18 (Doc. No. 23). Thus to the extent that an ACH transaction was initiated within the United States, we see nothing in the Account Agreement that would obligate

11

TD to follow the NACHA rules for processing that transaction.

TD argues further that Plaintiffs "have not alleged that *any* of the ACH debits at issue were initiated outside of the United States," Doc. No. 23 at 18 n. 12 (emphasis in original), and thus this portion of the breach claim should be dismissed in its entirety. We disagree. The Plaintiffs state in the Complaint that many payday lenders are based offshore or on Native American reservations. Compl. at ¶ 4. Though the Complaint fails to state whether Plaintiffs' specific lenders are based outside of the United States,[4] at this stage the Complaint does not require "detailed factual allegations." Iqbal, 556 U.S. at 678. Again, the touchstone is plausibility. Ethypharm, 707 F.3d at 231 n. 14. Taking the Plaintiffs' allegations as true, the Complaint raises a plausible claim that some number of the loans originated outside of the United States. The Account Agreement provides that the parties must abide by the NACHA rules for the processing of those transactions.

The question then becomes whether TD, by processing these allegedly unlawful transactions, was plausibly in breach of the NACHA Rules. The Complaint alleges that the "NACHA Rules ... require TD Bank to block transactions it knows to be unlawful or unauthorized under NACHA rules." Id. at ¶ 167. Thus, the Plaintiffs

---

[4] Plaintiffs later address this in their Opposition brief, Doc. No. 25 at 18 n. 8.

claim, TD "breached its contractual promise to process ... ACH transactions in accordance with the NACHA rules when it processed Illegal Payday Loan transactions it knew to be unlawful." Id. at ¶ 169.

Plaintiffs claim that TD's obligation to block unlawful transactions stems from two provisions of the NACHA Rules. First, they quote Rule 3.1.1, which states in relevant part that an RDFI "'must accept Entries that comply with these Rules and are received with respect to an account maintained with that RDFI, *subject to its right to return Entries under these Rules*.'" Id. at ¶ 40 (emphasis in Complaint). We are unsure why Plaintiffs cite to this provision. As a general matter, it requires an RDFI to accept entries, not block or return them. The emphasized language merely means that if the Rules provide the RDFI with the right to return an entry, it may do so without running afoul of 3.1.1. There is nothing in the subsection requiring an RDFI to exercise those return rights. This provision cannot provide the basis for Plaintiffs' breach claim.

Plaintiffs also cite to Section 3.11 for this obligation: "'[a]n RDFI *must* recredit the accountholder for a debit Entry that was, in whole or in part, not properly authorized under these Rules, as required by these Rules, applicable Legal Requirements, or agreement between the RDFI and the accountholder.'" Id. at ¶ 41

(alteration and emphasis in Complaint).[5] Initially, we do not see how this provision could create several of the obligations that Plaintiffs claim it does. Rather than requiring an RDFI to "monitor," "block," "reject," or otherwise refuse to process these transactions, the Rule uses the term "recredit." We understand this to mean that the Rule's only possible application would be *after* the transaction has occurred. This interpretation is bolstered by our reading of Rule 3.1.1, discussed above, which requires an RDFI to process transactions subject only to its right of return. Thus we understand the two rules to work in tandem: an RDFI must initially accept the entries per Rule 3.1.1, and can later return the entry and recredit the Receiver's account per Rule 3.11. See generally Engelhard Corp. v. N.L.R.B., 437 F.3d 374, 381 (3d Cir. 2006) (Court must read, "if possible, all provisions of a contract together as a harmonious whole."). Thus to the extent Plaintiffs claim that TD breached the NACHA Rules by failing to properly monitor or reject the allegedly unlawful transactions, we see no basis in this provision for such a claim to proceed.

---

[5] Plaintiffs appear to be quoting from an earlier version of the rule, which was amended (effective March 15, 2013) to read as follows:

> An RDFI must recredit the accountholder *to the extent provided in this Section 3.11* for (a) a debit Entry *to a Consumer Account* ... that was, in whole or in part, not properly authorized under these Rules, as required by these Rules, applicable Legal Requirements, or agreement between the RDFI and the account holder; ...

NACHA Rules Section 3.11 (emphasis added for clarity). This alteration is discussed further below. Neither party has addressed what version of the NACHA Rules should apply to the conduct at issue here, though our analysis would remain the same regardless.

Plaintiffs do allege however that TD ran afoul of Rule 3.11 by failing to recredit "the accounts of its customers it wrongfully debited for Illegal Payday Loans." Compl. at ¶ 42. TD counters by arguing that the recredit obligation is only triggered when a customer challenges the allegedly unauthorized debit, and notes that the Plaintiffs fail to allege that any such challenges occurred. See Doc. No. 23 at 18. We agree with TD.

It is a fundamental principle of contract interpretation that specific provisions control more general ones. See generally 11 Williston on Contracts § 32:10 (4th ed. 2014). Courts in both Pennsylvania and New York follow this principle. See Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 247 (3d Cir. 2008) (applying Pennsylvania law); Cnty. of Suffolk v. Alcorn, 266 F.3d 131, 139 (2d Cir. 2001) (applying New York law). Additionally, the NACHA Rules incorporate this principle in Rule 1.1.3, which states that "[i]f there is a conflict in these Rules between a general provision applicable to all Entry types and a specific provision applicable to a specific Entry type, the provision for the specific Entry type governs."

Here, the language Plaintiffs cite is from an introductory portion of Rule 3.11 that is followed by several subsections which provide an RDFI's recredit obligations for specific types of entries. The subsection that applies here is 3.11.1, which reads in relevant part:

15

> An RDFI must promptly recredit the amount of a debit Entry to a Consumer Account[6] of a Receiver ... *if it receives notification from the Receiver* in accordance with Section 3.12 (Written Statement of Unauthorized Debit), and such notification is received within fifteen calendar days from the date the RDFI sends or makes available to the Receiver information related to the debit Entry.

NACHA Rule 3.11.1 (2015) (emphasis added). Thus in regards to a consumer account, the recredit obligation arises only after the Receiver provides the RDFI with a written challenge to the debit.

The language relied upon by the Plaintiffs appears to not be a standalone obligation, but rather an introductory paragraph that provides the general outline of an RDFI's recredit obligation.[7] Subsection 3.11.1 on the other hand provides the terms that apply to the Plaintiffs' specific situation. Under both the terms of the NACHA Rules and basic contract interpretation principles, the specific provision must control. We thus find that the NACHA Rules did not require TD to recredit the Plaintiffs' accounts absent the receipt of a written challenge.[8] Because the Plaintiffs do not

---

[6] Defined by the Rules as: "an account ... established by a natural person primarily for personal, family or household use and not for commercial purposes."

[7] This understanding is bolstered by the language added to Section 3.11 in 2013 (noted above in footnote 5), which made clear that the recredit obligation only arose "to the extent provided in this Section." This alteration indicates that the introductory section is limited by the specific provisions that follow.

[8] While we do not look outside of the contract for interpretative guidance when its terms are unambiguous (as they are here), we note that this understanding of the Rules is consistent with NACHA's own interpretation. NACHA has explained that in the absence of a consumer complaint, an RDFI will generally "have no basis on its own by which to dispute the validity of a[n ACH] transaction." NACHA, ACH Operations Bulletin #2-2013: High Risk

16

claim that they challenged the debit entries, this portion of their breach claim cannot proceed.

For their final breach allegation, Plaintiffs claim that TD breached the Account Agreement by assessing "overdraft and/or returned item fees ... on transactions that were unlawful or unauthorized under NACHA Rules." Compl. at ¶ 170-71. They allege that these fees exacerbated their debt problems, and the revenue generated from the fees was "a primary motivation for TD Bank's conduct." Id. at ¶ 15. Plaintiffs do not point to a specific provision of the Account Agreement to support this claim, but rather state that it "does not authorize, expressly or impliedly, TD Bank to assess overdraft and/or returned item fees generated as a result of illegal and unenforceable transactions." Id. at ¶ 46.

This claim is defeated by the actual terms of the Agreement. It provides that "[o]verdraft fees may be assessed on items presented for payment that bring your Account into a negative balance, as well as any subsequent transactions presented for payment while the Account has a negative balance." Account Agreement at 13. Further, the contract states that if an overdraft occurs, TD "may demand immediate repayment of any overdraft and

_____

Originators and Questionable Debit Activity (March 14, 2013) (Doc. No. 23-7 at 6 of 10). This is because "[t]he ACH message itself, like any check or other payment instrument, provides no information about the substance of the transaction to which the payment relates that would enable to RDFI to make such a judgment." Id. Instead, the network is "set up to empower consumers to dispute transactions that they believe were not validly authorized." Id.

charge ... an overdraft fee." Account Agreement at 14. We see nothing in the Account Agreement — and Plaintiffs do not point to anything — that conditions TD's ability to charge these fees on the nature of the transaction that overdraws the account. While it is unfortunate that these fees contributed to Plaintiffs' dire financial circumstances, TD did not breach the Account Agreement by assessing them.

## C. Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs also claim that TD breached the implied covenant of good faith and fair dealing. The substance of this claim essentially mirrors their breach claim; that is, Plaintiffs allege that TD breached the covenant by (1) knowingly processing allegedly unlawful payday loan transactions, and (2) charging overdraft fees generated as a result. Compl. at ¶ 177.

Both Pennsylvania and New York recognize that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." W. Run Student Hous. Associates, LLC v. Huntington Nat. Bank, 712 F.3d 165, 170 (3d Cir. 2013) (quotation marks omitted); see also Fishoff v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011) ("Under New York law, a covenant of good faith and fair dealing is implied in all contracts."). In both states, the implied covenant is described as an obligation to not "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the

contract." Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 817 (2d Cir. 2014) (quotation marks omitted); see also Hart v. Arnold, 884 A.2d 316, 333 (Pa. Super. 2005). Or more simply, "the implied covenant ensures that parties to a contract perform the substantive bargained-for terms of their agreement." Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 732 (S.D.N.Y. 1993) (internal quotation marks omitted). The Restatement provides the following examples of conduct that could violate the covenant: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Restatement (Second) of Contracts § 205. Notably, the covenant cannot be used to "override express contractual terms" or "add new terms to an agreement." In re IT Grp., Inc., 448 F.3d 661, 671 (3d Cir. 2006); see also Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005). Rather, it "can only impose an obligation 'consistent with other mutually agreed upon terms in the contract.'" Geren, 832 F. Supp. at 732 (quoting Sabetay v. Sterling Drug, Inc., 506 N.E.2d 919, 922 (N.Y. 1987)).

Plaintiffs' claim that TD breached the covenant by processing payday loan debits cannot proceed for several reasons. For one, it appears that Plaintiffs are asking us to read an entirely new term into the Account Agreement. That is, Plaintiffs would like the

implied covenant to require TD to monitor and/or block allegedly unlawful payday loan debits. But, as explained above, the actual contract between the parties contains no such obligation. A claim for breach of the implied covenant cannot proceed if it bears no relationship to the express terms of the contract. See, e.g., W. Run Student Hous. Associates, 712 F.3d at 170 ("[T]here must be some relationship to the provisions of the contract itself to invoke the duty of good faith."). Thus if there was a provision in the contract stating that TD would monitor all transactions and could block those it thought were improper, Plaintiffs could present a proper claim that TD used that discretion arbitrarily or in bad faith. But here, no such clause exists.[9] We cannot use the implied covenant to create an obligation that the parties did not agree to.

Additionally (and perhaps more importantly), we see no plausible implication in the Complaint that TD acted in bad faith by processing these transactions. After all, each of the allegedly improper debits occurred after the Plaintiffs received the loan funds and authorized the payday lenders to debit their accounts. It strains credulity to argue after the fact that TD "evaded the spirit" of the contract by processing debits initiated and authorized by the Plaintiffs. If anything, TD was acting in accord

---

[9] Plaintiffs' Response points to page 3 of the Account Agreement which allows TD to block or prohibit transactions relating to unlawful gambling. Doc. No. 25 at 23. As discussed above, this provision is inapplicable to the conduct at issue here.

with the Plaintiffs' reasonable expectations, not undermining them.

Plaintiffs' claim that TD breached the covenant by assessing overdraft fees must also fail. As explained above, TD's assessment of such fees was expressly provided for in its contract with the Plaintiffs. Plaintiffs cannot use the implied covenant of good faith and fair dealing to override express contractual terms.

## D. Unconscionability

Plaintiffs' third claim is that "TD Bank's policies and practices are or were substantively and procedurally unconscionable." Compl. at ¶ 180. They point to the following allegedly unconscionable practices: (a) TD's failure to disclose that it would charge overdraft fees resulting from unlawful transactions; (b) TD's failure to solicit Plaintiffs' consent prior to processing transactions that overdrew their accounts; and (c) TD's failure to alert Plaintiffs that payday loan debits would overdraw their account. Id. at ¶ 180(a)-(c). Additionally, Plaintiffs claim that the Account Agreement is a contract of adhesion, and also that it is unfair and misleading because it does not inform customers that they will be charged overdraft fees as a result of TD's processing of payday loan debits. Id. at ¶ 180(d)-(e). Plaintiffs seeks a declaration that these practices are unconscionable, and also a finding that the contract as a whole is unenforceable as a matter of law. Id. at ¶ 181.

Unconscionability "is a 'defensive contractual remedy which

21

serves to relieve a party from an unfair contract or from an unfair portion of a contract.'" Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (quoting Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138, 145 (Pa. Super. 1985)). In the absence of fraud, illegality, or duress, "[u]nconscionability is the rubric under which the judiciary may refuse to enforce unfair or oppressive contracts." Stanley A. Klopp, Inc. v. John Deere Co., 510 F. Supp. 807, 810 (E.D. Pa. 1981) aff'd, 676 F.2d 688 (3d Cir. 1982).

The doctrine of unconscionability has historically been used not as an affirmative claim, but rather as a defense to an enforcement action. In spite of this, Plaintiffs argue that we should allow an affirmative claim here because of this case's unique facts (i.e., TD already has the Plaintiff's funds and thus does not need to sue to enforce the contract). In this regard, Plaintiffs urge us to follow In re Checking Acct. Overdraft Litig., 694 F. Supp. 2d 1302 (S.D. Fla. 2010), which presented similar facts and allowed an affirmative unconscionability claim to survive a motion to dismiss. Though we agree with the Plaintiffs that there are factual similarities between that case and this one, we decline to create a cause of action where none exists under controlling state law.

New York law is absolutely clear on this question: "The doctrine of unconscionability is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery.

Under both the UCC and common law, a court is empowered to do no more than refuse enforcement of the unconscionable contract or clause." Super Glue Corp. v. Avis Rent A Car Sys., Inc., 132 A.D.2d 604, 606 (N.Y. 1987).

Similarly, Pennsylvania has always treated unconscionability as a defensive doctrine. See Salley v. Option One Mortg. Corp., 925 A.2d 115, 119 (Pa. 2007) ("The doctrine of unconscionability has been applied in Pennsylvania as both a statutory and a common-law defense to the enforcement of an allegedly unfair contract or contractual provision."). Plaintiffs cannot point to — and we have not found — any Pennsylvania case allowing this type of claim to go forward. In fact, both the Commonwealth courts and this Court routinely dismiss affirmative unconscionability claims. See Williams v. Enter. Holdings, Inc., No. 12-05531, 2013 WL 1158508, at *3 (E.D. Pa. Mar. 20, 2013) ("Under Pennsylvania law, 'Unconscionability may only be asserted as a defense in an action on a contract for the sale of goods.'")(quoting Witmer v. Exxon Corp., 394 A.2d 1276, 1286 (Pa. Super. 1978)); Toth v. Nw. Sav. Bank, No. GD-12-008014, 2013 WL 8538695, at *16 (Pa. Com. Pl. Mar. 1, 2013) (rejecting In re Checking Acct. Overdraft Litig. because "there is no Pennsylvania case law permitting a party to pursue a separate cause of action on the ground that the other party is enforcing an unconscionable provision in the parties' agreement").

As there is no precedent in either New York or Pennsylvania

allowing for an affirmative unconscionability claim, this claim must be dismissed.

**E. Conversion**

Plaintiffs' fourth claim is for conversion. They claim that TD has "wrongfully collected overdraft and/or returned item fees from Plaintiffs and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them." Compl. at ¶ 186. Further, they claim that TD has, "without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Classes, without legal justification." Id. at ¶ 187.

In Pennsylvania, "conversion constitutes 'the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.'" Turevsky v. FixtureOne Corp., 904 F. Supp. 2d 454, 462 (E.D. Pa. 2012) (quoting McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n. 3 (Pa. Super. 2000)). New York law is similar; to survive a motion to dismiss "a plaintiff must allege: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of

the plaintiff's rights." DeAngelis v. Corzine, 17 F. Supp. 3d 270, 282 (S.D.N.Y. 2014) (quotation marks omitted).

Fatal here is the requirement in both states that the alleged conversion be "unauthorized" or "without the owner's consent." As we have already discussed, the Account Agreement provided TD with the right to assess these fees. When Plaintiffs signed the contract, they consented to this assessment. Accordingly, they cannot state a plausible claim for conversion. See, e.g., Pioneer Comm. Funding Corp. v. Am. Fin. Mortgage Corp., 855 A.2d 818, 827 (Pa. 2004) ("[A] claim of conversion cannot be sustained in the face of lawful justification on the part of the asserted tortfeasor.").

## F. Unjust Enrichment

Plaintiffs' claim for unjust enrichment must also fail based on clear precedent from both Pennsylvania and New York. In both states, where the subject matter of the claim is governed by a contract, a plaintiff cannot pursue (and a court cannot grant) relief based on an unjust enrichment theory. See Grudkowski v. Foremost Ins. Co., 556 F. App'x 165, 169-70 (3d Cir. 2014) ("Under Pennsylvania law, the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings.") (quotation marks omitted); Wilson Area Sch. Dist. v.

_Skepton_, 895 A.2d 1250, 1254 (Pa. 2006) ("[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract."); _MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc._, 157 F.3d 956, 964 (2d Cir. 1998) ("[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract, i.e., unjust enrichment, for events arising out of the same subject matter.") (quotation marks omitted); _Pappas v. Tzolis_, 982 N.E.2d 576, 580 (N.Y. 2012) ("A party may not recover in unjust enrichment where the parties have entered into a contract that governs the subject matter.")(quotation marks omitted).

Here, the relationship between TD and the Plaintiffs is founded upon the Account Agreement and the subject matter of this suit is closely related to that of the contract. Consequently, this claim must be dismissed.

## G. Pennsylvania Consumer Protection Claim

Plaintiff Andrichyn, a Pennsylvania resident, brings this claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 _et seq._ Specifically, he claims that TD violated the law's "catchall" provision, which prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." _Id._ § 201-2(4)(xxi). The law provides for a private cause of action where a

consumer "suffers any ascertainable loss ... as the result of the use ... of a method, act or practice declared unlawful" by the law. 73 Pa. Stat. § 201-9.2(a). Thus to state a claim under the catchall provision, Andrichyn must allege (1) that TD engaged in "fraudulent or deceptive conduct which create[d] a likelihood of confusion or of misunderstanding"; (2) an ascertainable loss; and (3) causation. See Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009). The initial question we must address then is whether Andrichyn adequately pleads the existence of fraudulent or deceptive conduct. He makes four allegations in this regard, which we will address in turn.

Andrichyn's first allegation is that TD engaged in deceptive conduct by "processing debits on Illegal Payday Loans" in violation of Pennsylvania's public policy. Compl. at ¶ 208(a). This allegation typifies the kind of "naked assertion[] devoid of further factual enhancement," that must be dismissed. Iqbal, 556 U.S. at 678. Andrichyn points to no authority showing that an RDFI's processing of these transactions is against the Commonwealth's law or public policy.

The second allegation is that TD deceptively "represent[ed] that it would act in accordance with NACHA Rules and not process illegal transactions, when in fact it did not." Compl. at ¶ 208(b). If Andrichyn is claiming here that the TD made these representations in the Account Agreement, we already addressed this

27

in regards to the breach claim and determined that no such provision exists. If Andrichyn is claiming that TD made these alleged representations outside of the Account Agreement, he has failed to allege that such representations were in fact made. Thus this allegation also cannot survive the Motion to Dismiss.

The third allegation states that TD acted fraudulently or deceptively by processing payday debits "despite rules and laws requiring the bank to monitor and reject such transactions." Id. at ¶ 208(c). This must be dismissed because Andrichyn fails to cite any such rules or laws. To the extent he is referring to the NACHA Rules, we already addressed that issue in regards to Plaintiffs' breach claim and found that those rules do not require RDFIs such as TD to monitor or reject these transactions.

Finally, Andrichyn alleges that TD's assessment of overdraft fees resulting from payday debits was deceptive and/or fraudulent because the Account Agreement did not allow for such fees. Id. at ¶ 208(d). But as we have already discussed in regards to Plaintiffs' breach claim, the Agreement does allow for the fees that Andrichyn challenges. Actions permitted by the express terms of the contract that he signed cannot plausibly be seen as either deceptive or fraudulent. See Hassler v. Sovereign Bank, 374 F. App'x 341, 344 (3d Cir. 2010) (affirming the dismissal of a

consumer protection claim[10] based on the assessment of overdraft fees where the contract between the consumer and bank explicitly provided for the conduct challenged by the plaintiff).

In sum, none of Andrichyn's allegations presents a legally cognizable claim that TD engaged in any deceptive or fraudulent conduct. This claim must therefore be dismissed.

**H. New York Consumer Protection Claim**

Plaintiff Williams, a resident of New York, brings this final claim under New York's general consumer protection law, General Business Law § 349. That law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). The law provides that "any person who has been injured by reason of any violation of this section" can bring an action for both injunctive and monetary relief. Id. at § 349(g).

To state a claim under § 349 a Plaintiff must allege that (1) the defendant's conduct was consumer-oriented, (2) the defendant's conduct was deceptive or misleading in a material way, and (3) the plaintiff was injured by the conduct. Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741, 744 (N.Y. 1995). As is the case with Pennsylvania's law, New York courts look at the conduct objectively, and limit the definition of

---

[10] Hassler applied New Jersey's consumer fraud statute, but we see no reason why the case's logic should not apply to our analysis of Pennsylvania's law.

deceptive or misleading acts to only "those likely to mislead a reasonable consumer acting reasonably under the circumstances." Id. at 745.

The dispositive question here is whether Williams plausibly pleads the existence of an objectively deceptive or misleading act. The allegations put forth in Williams's claim are exactly the same as those found in Andrichyn's Pennsylvania claim, save for the substitution of New York-specific language. See Compl. at ¶ 212. Consequently, Williams's GBL § 349 claim must be dismissed for the same reasons. That is, he fails to present a legally cognizable argument that TD engaged in any deceptive or misleading conduct.

**IV.   CONCLUSION**

For the foregoing reasons, the Plaintiffs' have failed to state a legally cognizable claim. The Motion to Dismiss (Doc. No. 23) is GRANTED, and this matter is DISMISSED with prejudice.